588 S.E.2d 655

STATE of West Virginia ex rel. CITIES OF CHARLESTON AND HUNTINGTON AND ITS COUNTIES OF OHIO AND KANAWHA, West Virginia, Petitioners

v.

WEST VIRGINIA ECONOMIC DEVELOPMENT AUTHORITY, a Public Corporation, Respondent

and

State of West Virginia ex rel. Rev. Jim Lewis and John Cooney, Petitioners

v.

West Virginia Economic Development Grant Committee; West Virginia Economic Development Authority; City of Charleston; Kanawha County Commission; City of Huntington; and Ohio County Commission, Respondents

and

Greenbrier County Coalition Against Gambling Expansion and Cabell County Coalition Against Gambling Expansion, Unincorporated Associations, Petitioners

v.

West Virginia Lottery Commission and John Musgrave, Its Director, Respondents

West Virginia Racing Association, Intervenor.

Nos. 31540, 31541 and 31564.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 10, 2003.

Decided Oct. 17, 2003.

Concurring Opinion of Justice Albright Dec. 8, 2003.

---

Starcher, C.J., filed a "concurring and lamenting" opinion

Stephen B. Farmer, Farmer, Cline & Arnold, Charleston, for Cities of Charleston and Huntington, and Counties of Ohio and Kanawha, WV and Robert P. Fitzsimmons, Fitzsimmons Law Offices, Wheeling, for Ohio County, WV.

Darrell V. McGraw, Jr., Attorney General, Charleston and William Herlihy, Special Assistant Attorney General, Paula L. Durst, Michael B. Stuart, Spilman, Thomas & Battle, Charleston, for West Virginia Economic Development Authority.

Larry L. Harless, Cottageville, for Reverend Jim Lewis and John Cooney, and Greenbrier County Coalition Against Gambling Expansion and Cabell County Coalition Against Gambling Expansion.

Darrell V. McGraw, Jr., Attorney General and Katherine A. Schultz, Senior Deputy Attorney General, Charleston, for West Virginia Economic Development Grant Committee.

Darrell V. McGraw, Jr., Attorney General and Thomas R. Goodwin, Special Assistant Attorney General, Johnny M. Knisely, II, Goodwin & Goodwin, Charleston, for West Virginia Lottery Commission and John Musgrave.

Rudolph L. DiTrapano, Sean P. McGinley, Richard S. Han, DiTrapano, Barrett & DiPiero, Charleston, for Intervenor West Virginia Racing Association.

Thomas P. Maroney, Thomas P. Maroney, LC, for Amicus Curiae, West Virginia Labor Federation, AFL–CIO.

Richard E. Boyle, Jr., Kay Casto & Chaney, for Amicus Curiae, West Virginia Amusement and Limited Video Lottery Operators Association, Inc.

Roger D. Hunter, for Amicus Curiae, School Building Authority of West Virginia.

Louis S. Southworth, II, Wendel B. Turner, Jackson & Kelly, and Thomas A. Heywood, Bowles Rice McDavid Graff & Love, for Amici Curiae, West Virginia Business Roundtable, West Virginia Business & Industry Council, and West Virginia Hospitality & Travel Association, Inc.

Vincent Trivelli, Stuart Calwell, for Amicus Curiae, Affiliated Construction Trades Foundation, a division of the West Virginia State Building and Construction Trades Council, AFL–CIO.

MAYNARD, Justice:

These consolidated cases arise from three petitions seeking writs of mandamus from this Court in regards to the issuance of revenue bonds by the West Virginia Economic Development Authority for the purpose of financing several economic development projects in the State certified by the West Virginia Economic Development Grant Committee pursuant to W.Va.Code § 29–22–18a(d) (2003).

In case number 31540, Petitioners City of Charleston, City of Huntington, Ohio County and Kanawha County seek a writ of mandamus from this Court to compel the West Virginia Economic Development Authority to issue revenue bonds to finance certified projects for which they received grants. For the reasons stated below, we grant this writ as moulded.

In case number 31541, Petitioners Rev. Jim Lewis and John Cooney seek a writ of

mandamus from this Court to either prevent the issuance of the bonds or at least to mandate that all private corporations and persons who benefit economically from the grants issued by the West Virginia Economic Development Authority be required to pay back to the State, at a low interest rate, the financial equivalent of the economic benefits received from the grants.[1] The petitioners also request that the Court refer this matter to a Special Commissioner for the taking of evidence. For the reasons stated below, we deny this writ.

In case number 31564, Petitioners Greenbrier County Coalition Against Gambling Expansion and Cabell County Coalition Against Gambling Expansion seek a writ of mandamus against the West Virginia Lottery Commission and Director John Musgrave requiring the Commission to cease and desist the further operation of video lottery gambling pursuant to W.Va.Code §§ 29–22A–1, *et seq.* and 29–22B–101, *et seq.*, and further requiring the complete shutdown of all other State lottery games until such time as these games are brought into full compliance with applicable legal requirements. For the reasons stated below, we deny this writ.

## I.

### FACTS

The background facts to this case are found in *State ex rel. WV Citizens Action Group v. Economic Development Grant Committee*, 213 W.Va. 255, 580 S.E.2d 869 (2003) (*Grant Committee I*). That case involved an appeal of the West Virginia Citizen Action Group from an order of the Circuit Court of Kanawha County upholding the con-

stitutionality of portions of W.Va.Code § 29–22–18a(d)(3) (2002), specifically as it pertained to the manner in which members of the West Virginia Economic Development Grant Committee ("Grant Committee") were appointed and the process by which the Grant Committee selected and approved grant applicants. This Court determined that the appointment mechanism for the Grant Committee violated the separation of powers and appointments provisions of the state constitution, and that the Legislature wrongfully delegated its powers in providing a lack of sufficient standards for the Grant Committee's use in evaluating the submitted grant applications. We concluded that due to these constitutional infirmities, the Grant Committee's approval of the various grant applications was of no force and effect.

The Legislature subsequently amended W.Va.Code § 29–22–18a in a special session for the purpose of conforming the statute to this Court's directives. Shortly thereafter, the Economic Development Grant Committee was reconstituted as provided for in the amended statute, and on August 20, 2003, the Grant Committee certified forty-nine grants and one loan in the aggregate amount of $225,855,802.00. The following day, the Governor, by executive order, directed the Economic Development Authority ("the Development Authority" or "the Authority") to issue revenue bonds to fund the certified projects pursuant to W.Va.Code § 29–22–18a(d)(1) (2003).[2] However, the Development Authority's Board refused to approve a resolution authorizing the issuance of the revenue bonds citing unresolved legal issues.

---

1. The respondents in case number 31541 are the West Virginia Economic Development Authority, the West Virginia Economic Development Grant Committee, the Cities of Charleston and Huntington, the Kanawha County Commission, and the Ohio County Commission.

2. According to W.Va.Code § 29–22–18a(d)(1):

The West Virginia economic development authority created and provided for in article fifteen, chapter thirty-one of this code shall, by resolution, in accordance with the provisions of this article and article fifteen, chapter thirty-one of this code, and upon direction of the governor, issue revenue bonds of the economic development authority in no more than two series to pay for all or a portion of the cost of constructing, equipping, improving or maintaining projects under this section or to refund the bonds at the discretion of the authority. Any revenue bonds issued on or after the first day of July, two thousand two, which are secured by state excess lottery revenue proceeds shall mature at a time or times not exceeding thirty years from their respective dates. The principal of, and the interest and redemption premium, if any, on, the bonds shall be payable solely from the special fund provided in this section for the payment.

On August 25, 2003, Petitioners the Cities of Charleston and Huntington and Counties of Ohio and Kanawha filed a petition for a writ of mandamus ("Cities and Counties Petition") with this Court against the Development Authority praying that this Court issue a writ of mandamus ordering the Authority to issue the revenue bonds. Petitioners Rev. Jim Lewis and John Cooney filed a petition with this Court ("Lewis Petition") on September 9, 2003, praying for a writ of mandamus to be directed against the West Virginia Economic Development Authority and others mandating, *inter alia*, that private corporations and persons that benefit economically from the grants be required to repay, at a low interest rate, the equivalent of the economic benefit received from the grants. By order of September 10, 2003, this Court consolidated these two cases and issued a rule to show cause against the respondents.

On September 16, 2003, Petitioners Greenbrier County Coalition Against Gambling Expansion and Cabell County Coalition Against Gambling Expansion presented to this Court their petition ("Coalition Petition") praying for a writ of mandamus to be directed against the West Virginia Lottery Commission and Director John Musgrave to, *inter alia*, compel the cessation of the operation of all video lottery machines and all other lottery games until such time that the games are brought into full compliance with all applicable legal requirements. Finally, on September 22, 2003, the West Virginia Racing Association moved this Court for leave to intervene in the proceedings initiated by Greenbrier County and Cabell County Coalitions Against Gambling Expansion. By order of September 23, 2002, this Court granted the Racing Association's motion for leave to intervene, awarded a rule to show cause, and consolidated all of the petitions for purposes of consideration and decision.[3]

---

**3.** At this point, we would like to acknowledge the valuable contributions of the several *amici curiae* in this case, the Affiliated Construction Trades Foundation, a division of the West Virginia State Building and Construction Trades Council, AFL–CIO; the West Virginia Amusement and Limited Video Lottery Operators Association, Inc.; the West Virginia Labor Federation, AFL–CIO; the

## II.

## STANDARD OF REVIEW

■ As noted above, the consolidated cases before us are original mandamus proceedings. It is well-settled that,

[a] writ of mandamus will not issue unless three elements co-exist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). With this in mind, we now review the several issues before us.

## III.

## DISCUSSION

*1. Petition 31540*

*Constitutionality of W.Va.Code § 29–22–18a(d) (2003)*

Petitioners Cities and Counties urge us to find that the Legislature's amendment of the Excess Lottery Revenue Fund statute cured the constitutional infirmities found by this Court in *Grant Committee I*. In Syllabus Point 2 of *Grant Committee I*, we held:

Due to the resulting encroachment on the executive power of appointment, the provisions of West Virginia Code § 29–22–18a(d)(3) (Supp.2002) that direct the presiding officers of each house of the Legislature to submit a list of prospective candidates to the Governor for the chief executive's selection of certain members of the West Virginia Economic Grant Committee are in violation of the separation of powers provision found in article five, section one of the West Virginia Constitution.

West Virginia Business Roundtable; the West Virginia Business & Industry Council; the West Virginia Hospitality & Travel Association, Inc.; and the School Building Authority of West Virginia. We also express our appreciation to the parties for their well-argued presentations in these cases.

In Syllabus Point 3 of *Grant Committee I,* this Court held:

> The provisions of West Virginia Code § 29–22–18a(d)(3) (Supp.2002) that direct the Legislature's involvement in the appointment process of the members of the West Virginia Economic Grant Committee are in violation of the appointments provision found in article seven, section eight of the West Virginia Constitution.

Finally, in Syllabus Point 5, we held:

> When an enabling statute such as West Virginia Code § 29–22–18a(d)(3) (Supp. 2002) extends discretion to the executive branch in contemplation of an expenditure of public funds with only a broad statement of legislative intent and insufficient legislative guidance for the execution of that Legislative intent, the Legislature has wrongfully delegated its powers to legislate in violation of article six, section one of the West Virginia Constitution.

Accordingly, we concluded that it was

> incumbent upon the Legislature to amend the subject legislation to provide for the executive appointment of the members of the Grant Committee without use of a submitted list of nominees from the presiding officers of the two houses of the Legislature and to further provide the necessary guidance in the form of legislative standards that will enable the Committee to perform its statutory task of reviewing and selecting among the submitted project applications in accord with the announced legislative objective of economic development.

*Grant Committee I,* 213 W.Va. at 280, 580 S.E.2d at 894.

In response to our holdings in *Grant Committee I,* the Legislature amended W.Va. Code § 29–22–18a(d) to provide, in part:

> (6) For the purpose of certifying the projects that will receive funds from the bond proceeds, a committee is hereby established and comprised of the governor, or his or her designee, the secretary of the

department of tax and revenue, the executive director of the West Virginia development office and six persons appointed by the governor: *Provided,* That at least one citizen member must be from each of the state's three congressional districts.[4] (Footnote added.)

We find that this amendment conforms to our directive in *Grant Committee I* to amend the statute to provide for the executive appointment of the members of the Grant Committee without use of a submitted list of nominees from the presiding officers of the two houses of the Legislature. Accordingly, we hold that the State Excess Lottery Revenue Fund statute, W.Va.Code §§ 29–22–18a, as amended by Chapter 22, Acts of the Legislature, 2003, Second Extraordinary Session, does not violate the separation of powers provision in article five, section one of the West Virginia Constitution. We also hold that the State Excess Lottery Revenue Fund statute, W.Va.Code §§ 29–22–18a, as amended by Acts of the Legislature, Special Session, 2003, Chapter 29, does not violate the appointments provision in article seven, section eight of the West Virginia Constitution.

Also, in response to this Court's finding in *Grant Committee I* that the Legislature failed to provide suitable legislative standards for achieving economic development, the Legislature amended W.Va.Code § 29–22–18a(d) to provide:

> (8) When determining whether or not to certify a project, the committee shall take into consideration the following:
>
> (A) The ability of the project to leverage other sources of funding;
>
> (B) Whether funding for the amount requested in the grant application is or reasonably should be available from commercial sources;
>
> (C) The ability of the project to create or retain jobs, considering the number of jobs, the type of jobs, whether benefits are or will be paid, the type of benefits in-

---

**4.** The former version of W.Va.Code § 29–22–18a(d)(3), which was found constitutionally infirm by this Court provided that the six citizen members of the Grant Committee would be three persons "appointed by the governor from a list of five names to be submitted to the governor by the president of the West Virginia senate, and three persons appointed by the governor from a list of five names to be submitted to the governor by the speaker of the West Virginia house of delegates."

volved and the compensation reasonably anticipated to be paid persons filling new jobs or the compensation currently paid to persons whose jobs would be retained;

(D) Whether the project will promote economic development in the region and the type of economic development that will be promoted;

(E) The type of capital investments to be made with bond proceeds and the useful life of the capital investments; and

(F) Whether the project is in the best interest of the public.

(9) No grant may be awarded to an individual or other private person or entity. Grants may be awarded only to an agency, instrumentality or political subdivision of this state or to an agency or instrumentality of a political subdivision of this state.

The project of an individual or private person or entity may be certified to receive a low-interest loan paid from bond proceeds. The terms and conditions of the loan, including, but not limited to, the rate of interest to be paid and the period of the repayment, shall be determined by the economic development authority after considering all applicable facts and circumstances.

\* \* \*

(11) The committee may not certify a project unless the committee finds that the project is in the public interest and the grant will be used for a public purpose. For purposes of this subsection, projects in the public interest and for a public purpose include, but are not limited to:

(A) Sports arenas, fields[,] parks, stadiums and other sports and sports-related facilities;

(B) Health clinics and other health facilities;

(C) Traditional infrastructure, such as water and wastewater treatment facilities, pumping facilities and transmission lines;

(D) State-of-the-art telecommunications infrastructure;

(E) Biotechnical incubators, development centers and facilities;

(F) Industrial parks, including construction of roads, sewer, water, lighting and other facilities;

(G) Improvements at state parks, such as construction, expansion or extensive renovation of lodges, cabins, conference facilities and restaurants;

(H) Railroad bridges, switches and track extension or spurs on public or private land necessary to retain existing businesses or attract new businesses;

(I) Recreational facilities, such as amphitheaters, walking and hiking trails, bike trails, picnic facilities, restrooms, boat docking and fishing piers, basketball and tennis courts, and baseball, football and soccer fields;

(J) State-owned buildings that are registered on the national register of historic places;

(K) Retail facilities, including related service, parking and transportation facilities, appropriate lighting, landscaping and security systems to revitalize decaying downtown areas; and

(L) Other facilities that promote or enhance economic development, educational opportunities or tourism opportunities thereby promoting the general welfare of this state and its residents.

■ This Court now holds that the State Excess Lottery Revenue Fund statute, W.Va. Code §§ 29–22–18a, as amended by Chapter 22, Acts of the Legislature, 2003, Second Extraordinary Session, sets forth sufficient criteria to guide the West Virginia Economic Development Grant Committee in its execution of the Legislature's intent in enacting the statute. Having made these initial determinations, we now proceed to consider the new challenges to W.Va.Code § 29–22–18a (2003).

### 2. *Petitions 31540 and 31564*

### *The Constitutionality of the Video Lottery Acts*

The issues raised in the Cities and Counties Petition, the Coalition Petition, and the Intervenor Racing Association Brief concern the constitutionality of the State's video lottery statutes. According to W.Va.Code § 29–22–18a(a) "[t]here is continued a special

revenue fund within the state lottery fund in the state treasury which is designated and known as the 'state excess lottery revenue fund.'" Pursuant to W.Va.Code § 29–22–18a(b), for the fiscal year beginning July 1, 2003, the Lottery Commission was directed to deposit $19,000,000.00 from the state excess lottery revenue fund into the economic development project fund to repay the principal, interest, and redemption premium, if any, on the revenue bonds issued by the Economic Development Authority to pay all or a part of the cost of constructing, equipping, improving, and maintaining the projects certified by the Economic Development Grant Committee. W.Va.Code § 29–22–18a(d)(1) and (2). Revenues received under the provisions of W.Va.Code §§ 29–22A–10b and 10c of the Racetrack Video Lottery Act, and the Limited Video Lottery Act, W.Va. Code §§ 29–22B–101 to 1903, except amounts due the Lottery Commission under W.Va. Code § 29–22B–1408(a)(1), are to be placed in the State Excess Lottery Revenue Fund pursuant to W.Va.Code § 29–22–18a(a). In sum, because the revenue bonds issued by the Development Authority to fund the grants are paid for by video lottery proceeds generated under the Racetrack Video Lottery Act and the Limited Video Lottery Act, the viability of the grants depends on the constitutionality of these two Acts.

 We note at the outset that those who challenge the constitutionality of Legislative enactments face a heavy burden.[5]

The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its sta-

tion, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.

*Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162, 175 (1810). "A court has a duty to attempt to find a proper basis for upholding the validity of a legislative enactment when its constitutionality is challenged[.]" *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 746–47, 143 S.E.2d 351, 357 (1965) (citations omitted). Also, "[c]ourts must use restraint in the exercise of their power to declare legislative acts to be unconstitutional." *Gainer,* 149 W.Va. at 747, 143 S.E.2d at 357 (citation omitted). To this end, we have held:

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

5. The Coalition petitioners also allege that respondents, the West Virginia Lottery Commission and its Director, John Musgrave, are not operating the video lottery games in full compliance with statutory mandates. In support of their claims, the petitioners have filed with this Court an affidavit of Franklin D. Young in which Mr. Young states that he has personally witnessed violations of video lottery statutes at several business establishments in Jackson and Kanawha Counties. The Lottery Commission and its Director respond with an affidavit of Marion

Alvin Rose, Deputy Director of the State Lottery Office for Video Lottery Security. Ms. Rose states that a Lottery Program Specialist visited several of the businesses cited by Mr. Young. Attached to the affidavit are four checklist forms which appear to indicate that the applicable lottery rules were complied with at the businesses. After reviewing the exhibits and the arguments of the petitioners on this issue, this Court finds that the requirements for the issuance of a writ of mandamus are not present.

Syllabus Point 1, *State ex rel. Appalachian Power Company v. Gainer, supra.*

As originally enacted, our State constitution prohibited lotteries. According to former Article VI, Section 36, "[t]he legislature shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State." On November 6, 1984, the voters of the State ratified an amendment to Article VI, Section 36 to allow the Legislature to "authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law, either separately by this State or jointly or in cooperation with one or more states[.]" *State ex rel. Mountaineer Park v. Polan,* 190 W.Va. 276, 438 S.E.2d 308 (1993). Shortly thereafter, the Legislature enacted the State Lottery Act, W.Va.Code §§ 29–22–1 to –28, the purpose of which was,

> to establish and implement a state-operated lottery under the supervision of the state lottery commission and the director of the state lottery office who shall be appointed by the governor and hold broad authority to administer the system in a manner which will provide the state with a highly efficient operation.

W.Va.Code § 29–22–2 (1985).

In 1993, as a result of the Lottery Commission's expansion of its lottery operations to include an electronic video lottery game at Mountaineer Park's thoroughbred race track in Hancock County, this Court was faced with the question,

> whether the *Constitution* requires the legislature to pass laws which prescribe: (1) the manner in which electronic video lottery operations are regulated, controlled, owned and operated before any can be properly conducted; and (2) sufficient standards to guide the Lottery Commission so that the delegation of authority is

constitutional and does not vest the Lottery Commission with uncontrolled discretion.

*State ex rel. Mountaineer Park v. Polan,* 190 W.Va. at 279, 438 S.E.2d at 311 (footnote omitted). In Syllabus Point 1 of *Mountaineer Park,* we held:

> Article VI, section 36 of the *West Virginia Constitution* provides an exception to the prohibition against lotteries to allow the operation of a lottery which is regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law. Only those lottery operations which are regulated, controlled, owned and operated in the manner provided by general laws enacted by the West Virginia Legislature may be properly conducted in accordance with the exception created under article VI, section 36 of our *Constitution.*

Applying this rule to the facts before the Court, we concluded that,

> because the legislature has not enacted general laws for the regulation, control, ownership and operation of electronic video lottery, and because the legislature failed to prescribe adequate standards in the State Lottery Act to guide the Lottery Commission in the exercise of the power conferred upon it with respect to electronic video lottery, the Lottery Commission was without authority under the *Constitution* to establish electronic video lottery.

190 W.Va. at 285–86, 438 S.E.2d at 317–18. We did note, however that "[t]he legislature in subsequent legislation could, of course, amend [W.Va.Code §§ 29–22–1, *et seq.*] to clearly state that video gambling devices are part of the lottery system." 190 W.Va. at 285, 438 S.E.2d at 317.[6]

The Legislature quickly addressed this Court's holding in *Mountaineer Park* and enacted the Racetrack Video Lottery Act,

---

6. In *Mountaineer Park,* this Court briefly discussed the constitutionality of electronic video lottery. We recognized that electronic video lottery is different from the common state-run game, and we questioned in a footnote whether the voters who ratified the amendment to Article VI, Section 36 were approving video lottery operations. Finally, we could not find "that the State Lottery Act, which neither defines nor explicitly authorizes 'electronic video lottery,' constitutes a considered judgment by the legislature to implement such a far-reaching scheme to raise revenue." 190 W.Va. at 284, 438 S.E.2d at 316. Again, however, this was prior to the Legislature's creation of video lottery in the video lottery acts at issue in this case.

W.Va.Code §§ 29–22A–1, *et seq.*, in 1994. The purpose of the Act is "to define and provide specific standards for the operation of video lottery games at pari-mutuel racing facilities licensed by the state racing commission[.]" W.Va.Code § 29–22A–2(e) (1994). The Act defines video lottery as,

> a lottery which allows a game to be played utilizing an electronic computer and an interactive computer terminal device, equipped with a video screen and keys, a keyboard or other equipment allowing input by an individual player, into which the player inserts coins, currency, vouchers or tokens as consideration in order for play to be available, and through which terminal device the player may receive free games, coins, tokens or credit that can be redeemed for cash, annuitized payments over time, a non-cash prize or nothing, as may be determined wholly or predominantly by chance. "Video lottery" does not include a lottery game which merely utilizes an electronic computer and a video screen to operate a lottery game and communicate the results of the game, such as the game "Travel", and which does not utilize an interactive electronic terminal device allowing input by an individual player.

W.Va.Code § 29–22A–3(aa) (1994). "Video lottery game" is defined as,

> a commission approved, owned and controlled electronically simulated game of chance which is displayed on a video lottery terminal and which:
>
> (1) Is connected to the commission's central control computer by an on-line or dial-up communication system;
>
> (2) Is initiated by a player's insertion of coins, currency, vouchers or tokens into a video lottery terminal, which causes game play credits to be displayed on the video lottery terminal and, with respect to which, each game play credit entitles a player to choose one or more symbols or numbers or to cause the video lottery terminal to randomly select symbols or numbers;
>
> (3) Allows the player to win additional game play credits, coins or tokens based upon game rules which establish the random selection of winning combinations of symbols or numbers or both and the number of free play credits, coins or tokens to be awarded for each winning combination of symbols or numbers or both;
>
> (4) Is based upon computer-generated random selection of winning combinations based totally or predominantly on chance;
>
> (5) In the case of a video lottery game which allows the player an option to select replacement symbols or numbers or additional symbols or numbers after the game is initiated and in the course of play, either: (A) Signals the player, prior to any optional selection by the player of randomly generated replacement symbols or numbers, as to which symbols or numbers should be retained by the player to present the best chance, based upon probabilities, that the player may select a winning combinations; (B) signals the player, prior to any optional selection by the player of randomly generated additional symbols or numbers, as to whether such additional selection presents the best chance, based upon probabilities, that the player may select a winning combination; or (C) randomly generates additional or replacement symbols and numbers for the player after automatically selecting the symbols and numbers which should be retained to present the best chance, based upon probabilities, for a winning combination, so that in any event, the player is not permitted to benefit from any personal skill, based upon a knowledge of probabilities, before deciding which optional numbers or symbols to choose in the course of video lottery game play;
>
> (6) Allows a player at any time to simultaneously clear all game play credits and print a redemption ticket entitling the player to receive the cash value of the free plays cleared from the video lottery terminal; and
>
> (7) Does not use the following game themes commonly associated with casino gambling: Roulette, dice, or baccarat card games: Provided, That games having a display with symbols which appear to roll on drums to simulate a classic casino slot

machine, game themes of other card games and keno may be used. W.Va.Code § 29–22A–3(y)(1)–(7) (1999).

In 2001, the Legislature enacted the Limited Video Lottery Act, W.Va.Code §§ 29–22B–101, *et seq.*, the purpose of which "was to establish a single state owned and regulated video lottery thus allowing the State to collect revenue therefrom, control the operators of the machines, and stem the proliferation of gambling in the State." *Club Ass'n v. Wise*, 293 F.3d 723, 724 (4th Cir.2002) (footnote omitted).[7] The Act provides that all persons conducting limited video lottery on their premises must possess a video lottery retailer's license. W.Va.Code § 29–22B–501(d) (2001). It makes video gambling machines per se illegal gambling devices which may be seized and destroyed as illegal contraband. W.Va.Code § 29–22B–1801 (2001). Finally, those who possess unauthorized machines are subject to criminal prosecution. W.Va.Code § 29–22B–1703 (2001). Generally, the provisions of the Limited Video Lottery Act concerning the regulation and operation of video lottery machines are the same or substantially similar to the provisions of the Racetrack Video Lottery Act.

The Coalition Petitioners now argue that the video lottery games authorized by the video lottery statutes constitute video gambling and not a lottery. The petitioners cite for support this Court's declaration in *Mountaineer Park* that "electronic video lottery is different from the common state-run lottery games, and has been defined as 'video poker, keno and blackjack,'" 190 W.Va. at 284, 438 S.E.2d at 316, and *U.S. v. Dobkin*, 188 W.Va. 209, 212, 423 S.E.2d 612, 615 (1992), in which this Court found that "[video poker] ma-

chines ... have no relation whatsoever to a lottery or raffle."[8] In addition, petitioners aver that the 1984 electorate which approved of a lottery intended only to bring back state-run ticket lotteries when it voted to amend the constitution, not "hard-nosed" video gambling machines.

This Court has previously defined the term "lottery." In *State v. Matthews*, 117 W.Va. 97, 184 S.E. 665 (1936), we stated in Syllabus Point 1 that "[t]he word "lottery" is commonly understood to mean 'a scheme for the distribution of prizes by chance.'" Later in Syllabus Point 4 of *State v. Hudson*, 128 W.Va. 655, 37 S.E.2d 553 (1946), this Court held that "[t]he essential elements of a lottery are consideration, prize and chance; and any scheme or device, by which a person, for a consideration, is permitted to receive a prize or nothing, as may be determined predominantly by chance, is a lottery." Even though *Hudson* is almost sixty years old, its three-pronged definition of lottery "is still accepted by the overwhelming majority of jurisdictions, as well as the United States Supreme Court." *Opinion Of The Justices*, 795 So.2d 630, 635 (Ala.2001) (footnote omitted). *See also* 54 C.J.S. *Lotteries* § 2 (1987) ("A lottery is defined ... as a scheme for the distribution of prizes or things of value by lot or chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize[.]" (Footnote omitted.)).

In *State v. Hudson, supra*, the defendant asserted that the operation of a punch board was not a lottery so as to be prohibited under W.Va.Code § 61–10–11 (1939).[9] Specifically, the activity at issue involved,

---

**7.** The State estimated at the time that prior to the enactment of the Limited Video Lottery Act, more than 13,000 illegal gambling machines operated in State clubs, taverns, and other such businesses in the State. *See Club Association, supra.*

**8.** We do not find *Dobkin* dispositive of the issue before us. This Court's statement in *Dobkin* is unsupported by an analysis of prior case law. Also, our assertion in *Dobkin* that "although there is some element of skill involved, poker or any electronic simulation thereof, is a game of chance[,]" 188 W.Va. at 211, 423 S.E.2d at 614, favors a finding that the video machine at issue

constituted a lottery. Concerning this Court's statements in *Mountaineer Park*, see our previous discussion herein and footnote 6, *supra.*

**9.** In *State v. Greater Huntington Theatre Corp.*, 133 W.Va. 252, 255, 55 S.E.2d 681, 683 (1949), this Court recognized that W.Va.Code § 61–10–11 "was, apparently, enacted to meet the requirements of Section 36, Article VI of the Constitution of this State[.]" According to W.Va. Code § 61–10–11:

> If any person shall set up or promote or be concerned in managing or drawing a lottery or raffle, for money or other thing of value, or knowingly permit such lottery in any house

punching numbers from the board, which was four or five inches long and three inches wide. The winning number was concealed at the top and a controlling or tip number openly appeared elsewhere on the board. Certain tickets were placed or fastened in the board in such manner that a person who had purchased a chance could, by punching a particular place on the surface, eject from a small compartment or section a roll of paper which bore a specific number. In operating the board, the person keeps the rolls which carry his tip number until all the sections of the board are punched. The concealed number is then exposed. The person who has a tip number and a number which corresponds with the concealed number is the winner of the prize.

*State v. Hudson*, 128 W.Va. at 659, 37 S.E.2d at 556. This Court used the definition of lottery set forth in Syllabus 4 of *Hudson* to conclude that the operation of the punch board was a lottery.

It is clear that all of the elements of a lottery are present in the case at bar. Those who participated in the operation of the punch board paid for the right to share in the distribution of a prize, and the result of their venture depended entirely upon chance. No skill was required of any person who punched a number from the board, and the prize consisted of money. The punch board described in the evidence is a lottery, and this Court so holds.

*State v. Hudson*, 128 W.Va. at 666, 37 S.E.2d at 559.

Shortly, thereafter, this Court again had the opportunity to determine whether a certain activity constituted a lottery. In *State v. Greater Huntington Theatre Corp.*, 133 W.Va. 252, 55 S.E.2d 681 (1949), this Court affirmed judgment against the defendant for conducting a lottery in violation of W.Va. Code § 61–10–11. The activity at issue concerned a "give away" night at local theaters whereby movie patrons who purchased the price of admission and registered for a drawing won cash prizes if their names were drawn. In applying the definition of lottery set forth in *State v. Hudson*, this Court concluded that a purchase of a ticket for theater entertainment constituted consideration for a chance to win a prize, and that the right to a prize was determined by chance. Therefore, the "give away" night was a lottery prohibited by W.Va.Code § 61–10–11.

More recently, in *State v. Wassick*, 156 W.Va. 128, 191 S.E.2d 283 (1972), a pinball machine distributor appealed his conviction for violating W.Va.Code § 61–10–11. The specific issue was whether "free plays" on a pinball machine constituted a prize under the definition of lottery. This Court determined that they did and affirmed the judgment below. In explaining its decision, the Court stated:

The device used in the instant case was a multiple-coin pinball machine with complicated features that were seemingly designed for "payoffs" to be made in the use thereof. The "free plays" provided for in such machine are a prize because they have some value to the player either in playing additional games without charge or receiving a "payoff" and the fact that the "free games" are won predominantly by chance for a consideration because of the coins placed in the machine, we hold it to be a lottery per se under the lottery statute of this State.

under his control, or knowingly permit money or other property to be raffled for in such house, or to be won therein, by throwing or using dice, or by any other game of chance, or knowingly permit the sale in such house of any chance or ticket, or share of a ticket, in a lottery, or any writing, certificate, bill, token or other device purporting or intended to guarantee or assure to any person, or to entitle him to a prize, or a share of, or interest in, a prize to be drawn in a lottery, or shall, for himself, or any other person, buy, sell, or transfer, or have in his possession for the purpose of sale, or

with intent to exchange, negotiate, or transfer, or shall aid in selling, exchanging, negotiating, or transferring a chance or ticket, or a share of a ticket, in a lottery, or any such writing, certificate, bill, token or device, he shall by guilty of a misdemeanor, and, upon conviction, shall, in the discretion of the court, be confined in jail not more than one year or be fined not exceeding one thousand dollars, or both: Provided, however, That this section shall not be deemed to apply to that certain type or form of lottery or raffle designated and familiarly known as "policy" or "numbers."

*State v. Wassick,* 156 W.Va. at 136, 191 S.E.2d at 288. Thus, a review of the cases cited above indicates that this Court has traditionally applied its definition of a lottery broadly to include a number of different activities utilizing various devices including a punch board, a drawing, and a pinball machine. We will now determine whether video lottery machines as defined under the Racetrack Video Lottery Act and the Limited Video Lottery Act fit within this Court's broad definition of lottery.

The Racetrack Video Lottery Act and the Limited Video Lottery Act define video lottery as a lottery in which the player inserts coins and currency *"as consideration* in order for play to be available[.]" W.Va.Code §§ 29–22A–3(aa) (1999) and 29–22B–330 (2001) (emphasis added). In regards to the "prize" element, video lottery allows the player to receive free games or a voucher that can be redeemed for cash, a noncash prize or nothing. *Id.*[10] Concerning the element of chance, both Acts define a video lottery game as "a simulated game of chance." W.Va.Code §§ 29–22A–3(y) (1999) and 29–22B–332 (2001). In addition, the game "[i]s based upon computer-generated random selection of winning combinations based totally or predominantly on chance[.]" W.Va.Code §§ 29–22A–3(y)(4) and 29–22B–332(4). Moreover, video lottery is specifically defined as a lottery in which prizes may be awarded "as may be determined wholly or predominantly by chance." W.Va.Code §§ 29–22A–3(aa) and 29–22B–330.

■ We also note the legislative findings in W.Va.Code § 29–22A–2(a) (1994) of the Racetrack Video Lottery Act that "limited video lottery games authorized by this article are "lotteries" as that term is commonly understood and as that term is used in West Virginia Constitution, article VI, section thirty-six, the video lottery games authorized by this article being lottery games which utilize advanced computer technology[.]" The same legislative findings are made in W.Va.Code § 29–22B–201(2) (2001) of the Limited Video Lottery Act. This Court reviews legislative findings with great deference. In Syllabus

Point 2 of *State ex rel. Ohio Cty. Comm'n v. Samol,* 165 W.Va. 714, 275 S.E.2d 2 (1980), we held that "[a]bsent a claim that legislative findings are irrational or have no bearing on a legitimate State purpose, they are not subject to judicial investigation." Even "the legislative finding of a juristic fact is entitled to great weight and serious consideration[.]" *State ex rel. Cashman v. Sims,* 130 W.Va. 430, 449, 43 S.E.2d 805, 817 (1947) (citation omitted). We find, therefore, that video lottery as created in the Racetrack Video Lottery Act and the Limited Video Lottery Act constitutes a lottery for the purposes of W.Va. Const., Art. VI, § 36.

The Coalition petitioners aver, however, that even if the Court finds that video lottery is a lottery, it is not sufficiently "regulated, controlled, owned and operated" by the State as required by the exception for authorized lotteries in W.Va. Const., Art. VI, § 36. Instead, say the petitioners, the video lottery machines are operated, controlled and owned by their private manufacturers, operators, and retailers. Again, this Court disagrees.

A plain reading of W.Va. Const., Art. VI, § 36 indicates that the exception for authorized lotteries does not require lotteries that are regulated, controlled, owned and operated by the State in an absolute sense, but rather "in the manner provided by general law." The general law in the instant case is provided in the Racetrack Video Lottery Act and the Limited Video Lottery Act. The legislative findings of both Acts indicate:

(b) The Legislature further finds and declares that the state can control, own and operate a video lottery by possessing a proprietary interest in the main logic boards, all erasable, programmable read-only memory chips used in any video lottery equipment or games, and software consisting of computer programs, documentation and other related materials necessary for the video lottery system to be operated. The state may acquire a proprietary interest in video lottery game software, for purposes of this article, through outright ownership or through an exclusive product license agreement with a

---

10. Specifically, under W.Va.Code § 29–22A–3(aa), the player may receive, in addition, coins, tokens or credit. This code section does not refer to vouchers.

manufacturer whereby the manufacturer retains copyrighted ownership of the software but the license granted to the state is nontransferable and authorizes the state to run the software program, solely for its own use, on the state's central equipment unit and electronic video terminals networked to the central equipment unit.

(c) The Legislature further finds and declares that the state can control and regulate a video lottery if the state limits licensure to a limited number of video lottery facilities located at qualified horse or dog racetracks, extends strict and exclusive state regulation to all persons, locations, practices and associations related to the operation of licensed video lottery facilities, and provides comprehensive law enforcement supervision of video lottery activities.

W.Va.Code §§ 29–22A–2(b) and (c) (1994) and 29–22B–202 (2001).[11]

Our review of the challenged Acts indicates that the State's regulation, control, ownership, and operation of video lottery are extensive and are certainly sufficient to bring the video lottery within the scope of the exception for authorized lotteries in W.Va. Const., Art. VI, § 36. For example, video lottery terminals for use at licensed racetracks must be approved by the Lottery Commission and must conform to the exact specifications of the video lottery terminal prototype tested and approved by the Commission. W.Va.Code § 29–22A–5(f) (1994). The Lottery Commission directly or through a third-party vendor, maintains a central site system of monitoring the lottery terminals which may immediately disable the video lottery games and video lottery terminals. W.Va.Code §§ 29–22A–6(14)(h) (2001) and 29–22B–305 (2001). Applicants for a video lottery license must meet several qualifications in order to be approved. W.Va.Code §§ 29–22A–7 (2000) and 29–22B–502 (2001). Finally, the Lottery Commission is consid-

ered to own the main logic boards and all erasable programmable read-only memory chips. W.Va.Code §§ 29–22A–6(a)(7) (2001) and 29–22B–311 (2001). We conclude, therefore, that video lottery is "regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law" within the scope of the exception to the prohibition against lotteries in W.Va. Const., Art. VI, § 36.

Accordingly, we hold that the video lottery created pursuant to the Racetrack Video Lottery Act, W.Va.Code §§ 29–22A–1, *et seq.*, is a lottery which is regulated, controlled, owned and operated in the manner provided by general laws enacted by the West Virginia Legislature so that it properly and lawfully may be conducted in accordance with the exception to the prohibition against lotteries set forth in article VI, section 36 of the West Virginia Constitution. Further, we hold that the video lottery created pursuant to the Limited Video Lottery Act, W.Va.Code §§ 29–22B–101, *et seq.*, is a lottery which is regulated, controlled, owned and operated in the manner provided by general laws enacted by the West Virginia Legislature so that it properly and lawfully may be conducted in accordance with the exception to the prohibition against lotteries set forth in article VI, section 36 of the West Virginia Constitution.

### 3. Petition 31541

### Challenges to Projects Certified by the Grant Committee

Petitioners Rev. Jim Lewis and John Cooney[12] challenge the projects certified by the Economic Development Grant Committee on several grounds. First, the petitioners aver that the Grant Committee improperly failed to make findings to show that the projects certified by the Committee were for a public purpose and were consistent with the standards set forth in the State Excess

---

11. W.Va.Code § 29–22B–202(3)(A) of the Limited Video Lottery Act replaces "qualified horse and dog racetracks" with "qualified locations."

12. According to the petitioners' petition for a writ of mandamus, the Rev. Jim Lewis sues as a citizen, resident, taxpayer and voter of Charleston, Kanawha County, West Virginia, and of the

State of West Virginia. John Cooney sues as the owner and operator of Club Pet located in downtown Huntington, Cabell County, West Virginia, which is a small retail-service business devoted to the sale, care and attendant services regarding small animals used as domestic pets.

Lottery Revenue Fund statute at W.Va.Code § 29–22–18a(d)(8)(A) through (F). We disagree. First, nothing in W.Va.Code § 29–22–18a(d) (2003) requires the Grant Committee to make formal written findings, and this Court did not impose such a requirement in *Grant Committee I*. Second, the Grant Committee made a full record of its proceedings as evidenced by the transcripts of its meetings on July 16, 2003, July 28, 2003, August 15, 2003, and August 20, 2003, and its public hearing on August 4, 2003. These transcripts were filed with this Court. Finally, according to the affidavit of Brian M. Kastick, the Secretary of the West Virginia Department of Tax and Revenue and Chair and Member of the Grant Committee, the Committee's proceedings were open to the public and conducted pursuant to the State Register; notice of the public hearing was advertised in three newspapers of wide circulation; and oral and written public comment was solicited. Accordingly, we find no merit to the petitioner's argument on this issue.

■ Second, the petitioners assert that according to the provisions of W.Va.Code § 29–22–18a(d)(9) (2003), the financial equivalent of the economic benefit received by private entities from State monies must be repaid, at a low rate of interest, to the State. The petitioners misread the statute. The statute provides that "[g]rants may be awarded only to an agency, instrumentality or political subdivision of this state or to an agency or instrumentality of a political subdivision of this state." Further, "[t]he project of an individual or private person or entity may be certified to receive a low-interest loan paid from bond proceeds." The exhibits filed with this Court indicate that the forty-nine applicants certified to receive economic development grants were agents, instrumentalities, or political subdivisions of the State or an agency or instrumentality of a political subdivision. Finally, to the extent that the petitioners challenge the basic funding mechanism provided in W.Va.Code § 29–22–18a, such a challenge was rejected by this Court in *Grant Committee I*. Therefore, we find no

merit to the petitioners' argument on this issue.

Third, we reject the petitioners' constitutional challenges to W.Va.Code § 29–22–18a and to the projects certified by the Grant Committee. Specifically, the petitioners aver that the economic grants amount to violations of the due process rights of "smaller, publicly unsubsidized retail, service and entertainment enterprises." The petitioners also assert that the grants amount to an unconstitutional taking of these smaller businesses' property. It appears to this Court that these constitutional arguments rest at least in part on the proposition that the grants at issue are not for a public purpose, but rather will predominantly aid private commercial interests. However, we heretofore rejected the same claim in *Grant Committee I*.

■ Concerning challenges to the individual projects certified, the Legislature has reposed broad discretion in the Grant Committee to select economic development projects that meet with the Legislature's declared objective of economic development. After carefully reviewing the pleadings and exhibits submitted to this Court, we are unable to conclude that the projects certified by the Grant Committee failed to take into consideration the Legislature's directives set forth in W.Va.Code §§ 29–22–18a(d)(8)(A) through (F) and (11)(A) through (L).

■ Finally, the petitioners assert that the economic grants amount to "the single biggest anti-woman, sexist operation of the State in its 140–year history." Specifically, it appears that the petitioners' argument is that the grants at issue will result in the creation of retail, service, and entertainment jobs in which, petitioners allege, women traditionally have received less pay than their male counterparts and are systematically and disproportionately subjected to employment injustices. Because we find that such a claim is speculative, we conclude that the petitioners have failed to state a cause of action. Accordingly, we find no merit to the petitioners' averments on this issue.[13]

**13.** This Court has also reviewed the other contentions set forth by the petitioners which are not specifically addressed above, and we likewise find that these contentions fail to support the issuance of the writ prayed for by the petitioners.

In sum, this Court has determined that the Legislature cured the constitutional infirmities in W.Va.Code § 29–22–18a by amending that statute to conform to this Court's directives in *Grant Committee I.* We also have found that the video lottery created by the Racetrack Video Lottery Act and the Limited Video Lottery Act, which serves as the funding source of the revenue bonds issued by the Economic Development Authority pursuant to W.Va.Code § 29–22–18a, is a lottery which is regulated, controlled, owned and operated in the manner provided by general laws of the Legislature within the scope of the exception to the prohibition against lotteries in W.Va. Const., Art. VI, § 36. Finally we have rejected all other legal challenges brought against W.Va.Code § 29–22–18a, the certification of the projects by the Economic Development Grant Committee, and the issuance of the revenue bonds by the Development Authority. Accordingly, this Court denies the writs prayed for by the petitioners in case numbers 31541 and 31564.

█ In case number 31540, the Cities and Counties petitioners urge this Court to issue a writ of mandamus to compel the Economic Development Authority to issue revenue bonds in accord with W.Va.Code § 29–22–18a(d)(1) (2003) in order to finance the projects certified by the Grant Committee and particularly the certified projects sponsored by the petitioners. According to W.Va.Code § 29–22–18a(d)(1) in relevant part,

> The West Virginia economic development authority created and provided for in article fifteen, chapter thirty-one of this code shall, by resolution, in accordance with the provisions of this article and article fifteen, chapter thirty-one of this code, and upon direction of the governor, issue revenue bonds of the economic development authority in no more than two series to pay for all or a portion of the cost of constructing, equipping, improving or maintaining projects under this section or to refund the bonds at the discretion of the authority.

█ We agree with the Cities and Counties that W.Va.Code § 29–22–18a(d) provides a mandatory duty on the part of the Development Authority to issue the revenue bonds in accord with the specific terms of that code section. "It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syllabus Point 1, *Nelson v. W.Va. Pub. Employees Ins. Bd.,* 171 W.Va. 445, 300 S.E.2d 86 (1982). We discern nothing in W.Va.Code § 29–22–18a(d) which grants discretion to the Authority to refuse to issue the bonds once the Governor has so directed.[14]

However, this Court is extremely reluctant to compel a public corporation and government instrumentality of another branch of State government to incur debt.[15] We are also cognizant that the issuance of public bonds may rest upon factors other than their legality such as conditions of the bond market. This Court can no more control market conditions which govern the timing of the issuance of bonds than it can control the weather. It is possible that subsequent to our decision herein, market conditions could become unfavorable which would force a delay in the issuance of the bonds. In such an event, we do not believe that the Authority

---

14. W.Va.Code § 29–22–18a(d) specifies the *manner* in which the bonds are to be issued which is by resolution of the Authority and in accordance with the provisions of article 22 of chapter 29 and article fifteen, chapter thirty-one of the West Virginia Code.

15. According to W.Va.Code § 31–15–5 (1989), in part:

> The West Virginia economic development authority heretofore created is hereby continued as a body corporate and politic, constituting a public corporation and government instrumentality.

> The authority shall be composed of a board of members consisting of a chairman, who shall be the governor, or his designated representative, the tax commissioner and seven members who shall be appointed by the governor, by and with the advice and consent of the Senate, and who shall be broadly representative of the geographic regions of the state. The board shall direct the exercise of all the powers given to the authority in this article. The governor shall also be the chief executive officer of the authority, and shall designate the treasurer and the secretary of the board.

should be constrained by an order of this Court from responding to changing economic conditions. We note that the only reasons given by the Authority for refusing to follow the Governor's directive to issue the bonds were the legal challenges in the instant cases. We now have resolved *all* of these legal challenges. Therefore, we are confident that, absent some currently unforeseen economic circumstances which would compel a different response, the Development Authority will move with dispatch to issue the bonds in the manner provided by W.Va.Code § 29–22–18(a)(1) and in accord with the Governor's directive. For these reasons, we grant the writ of mandamus as moulded in case number 31540, and we direct the West Virginia Economic Development Authority to issue the revenue bonds in the manner provided in W.Va.Code § 29–22–18a(d) (2003) if all nonlegal factors so permit. Once again, let us be perfectly clear. As a result of this decision, there exists no constitutional, statutory, or other legal impediment to the immediate issuance and sale of the subject revenue bonds.

In closing, having resolved the legal issues herein, this Court believes that a few comments are in order. First, we wish to emphasize the very limited nature of our review of the challenged legislation. Because the general powers of the Legislature are almost plenary, this Court's sole concern in reviewing a legislative enactment is to determine whether it offends any provisions of the State or Federal Constitutions. As noted above, in considering the constitutionality of a legislative enactment, we exercise due restraint and will find a statute unconstitutional only when the negation of legislative power appears to us beyond a reasonable doubt. *See* Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer, supra.* In the instant case, the negation of the Legislature's power to enact the Racetrack Video Lottery Act, the Limited Video Act, and the State Excess Lottery Revenue Fund statute does not appear to us beyond a reasonable doubt.

We further note that several of the challenges to the subject legislation are based on public policy grounds. However, "[c]ourts are not concerned with questions relating to

legislative policy." Syllabus Point 1, *in part, State ex rel. Appalachian Power Co. v. Gainer, supra.* While there may be individual members of this Court who agree with several of the concerns raised by the Coalition Petitioners in their challenges to the video lottery, it simply is not the role of this Court to determine the wisdom or advisability of State-sanctioned video lottery games. In regards to the State Excess Lottery Revenue Fund statute, several individual members of this Court doubtless would have sought to promote economic development by other means. Perhaps some of us question the economic utility of several of the projects in the public interest and for a public purpose listed by the Legislature in W.Va.Code § 29–22–18a(d)(11) and approved by the Grant Committee, but it is not our function to base decisions on such personal concerns. Frankly, some of us might have done things differently if we were legislators, but we are not. We simply cannot emphasize strongly enough that our inquiry herein is strictly limited to the constitutionality of the subject legislation and not a personal estimation of its advisability or effectiveness.

Finally, this Court believes that a major disadvantage of economic development schemes such as the one devised in W.Va. Code § 29–22–18a, is that such schemes are inherently subject to criticism and open to claims of favoritism, and it is that favoritism or appearance of favoritism that inevitably taints it. Petitioners Lewis and Cooney leveled several charges of favoritism against the Grant Committee and "top legislators." For example, the petitioners assert that a majority of counties did not receive economic development grant money, including several disadvantaged counties, because these counties did not have members on the Grant Committee or top legislators "steering" the money. The disgruntled petitioners also allege that the seventeen counties which are due to receive over $200 million of the grant money are home to either Grant Committee members or the twelve top legislators. This latter charge is also cited in a recent local newspaper article.[16] According to this article, every

---

**16.** Scott Finn, *Grants Panel Has Pet Projects Legislative Leadership's Home Counties Win Big* Money, The Charleston Sunday Gazette–Mail, August 24, 2003, at 1A.

member of the Grant Committee brought home money for at least one project in his or her county. In addition, the counties served by the Senate and House Rules Committees—made up of the chairpersons of several powerful committees, such as judiciary and finance, as well as the Senate President, Speaker of the House, and majority and minority leaders—represent 56% of the State's population but received 78% of the economic development grant funds. Such alleged appearances of favoritism are bound to meet with public resistance and the court challenges which usually accompany such resistance. However, whether true or not, these types of claims and charges are actually political and policy questions and, at least as framed here, not legal questions. These are issues which should not be addressed by a court but are more properly decided by the Legislature or ultimately the people on election day.

## IV.

## CONCLUSION

Accordingly, for the reasons stated above, the writ of mandamus sought by the Cities of Charleston and Huntington and the Counties of Ohio and Kanawha, West Virginia in case number 31540 is granted as moulded.

The writ of mandamus sought by the Reverend Jim Lewis and John Cooney in case number 31541 is denied.

The writ of mandamus sought by the Greenbrier County Coalition Against Gambling Expansion and the Cabell County Coalition Against Gambling Expansion in case number 31564 is denied.

The Clerk of this Court is directed to issue the mandate in this case forthwith.

No. 31540—Writ granted as moulded.

No. 31541—Writ denied.

No. 31564—Writ denied.

Justice STARCHER concurs and files a concurring and lamenting opinion.

Justice ALBRIGHT concurs and reserves the right to file a concurring opinion.

STARCHER, C.J., concurring and lamenting.

I have two opinions about this case—a professional opinion, and a personal opinion. I will first summarize these two opinions, and then discuss them separately.

Professionally, I think that the Legislature, which has overwhelmingly and repeatedly voted to establish a massive, statewide, government-operated gambling system in West Virginia—and to finance a significant piece of our public budget from that system—has the legal right to do so under our *Constitution.*

Personally, I question whether it is right or wise for my government to set up and operate this massive, statewide, government-operated gambling system—and to use, in managing this system, thousands of privately-managed sites that are impossible to supervise and monitor; and to also use thousands of gambling devices that are known to be especially dangerous and addictive; and then to make it next to impossible for future generations to cancel, revamp, or restrict this system, because of the legal obligation to pay off bonds that are based on gambling revenues.

*A Professional Opinion*

Professionally, as a lawyer and justice whose job is to apply legal principles that have evolved over many years, I concur with the majority opinion's conclusion that the language of our 1984 constitutional "Lottery Amendment" gave the Legislature the authority to set up and operate the massive, statewide, government-operated gambling system that is challenged in the instant case.

The legal issue before this Court is not whether the voters in 1984 had "video poker-type" machines in their conscious minds when they approved of state-run lotteries. Rather, the issue is whether the language that the voters approved created enough constitutional "elbow room" to allow the Legislature to create the current system. As the majority opinion demonstrates—it does.

### A Personal Opinion

To repeat: the Legislature has decided to have massive, statewide, government-operated gambling, in thousands of privately-managed locations in West Virginia—and to fund a good bit of the State's budget with the revenues from this gambling enterprise.

Regardless of one's ultimate position on the wisdom of this course, it is beyond dispute that West Virginia, as a result of this decision by the Legislature, does now and will in the future increasingly suffer a substantial amount of tragic harm and injury to individuals, families, businesses, and communities.

Under the system created by the Legislature, we can expect to have between twenty to forty (closer to forty) *thousand* West Virginia adults, and about five *thousand* West Virginia teenagers—at any given time—who are problem or pathological gamblers.

The effects of these thousands of West Virginians' severe gambling problems—on their families, jobs, schools, communities, and households—will directly and negatively affect several hundred thousand other West Virginians: family members, employers, etc. Many personal bankruptcies will originate in gambling problems, as will many incidents of crime, suicide, divorce, and domestic violence. Less than five percent of West Virginians with gambling problems will seek help; of those, perhaps half will be able to recover significantly.[1]

This, in rough summary, is the tragic human cost (in numbers) that our Legislature has decided our State will pay, to get the benefits of widespread, state-operated, "convenience" gambling.

Each of these tragic numbers, of course, has a human face.

When I think about the "instant lottery ticket" system that the Legislature has created in every community in our State, the first image that comes to my mind is the memory of two poorly-dressed women whom I recently saw, as they were sitting in a beat-up car, outside a convenience store.

The women were feverishly scratching the surfaces of their lottery tickets to see if they had a winning number. When they were done, they headed inside to buy some more tickets.

This, I thought, is how we are financing our senior citizens' centers—on the backs of these low-income people's wishful imagination that they might miraculously escape their materially impoverished existence by "hitting it big."

I thought of the Bible verse—"insofar as you do it to the least of these, you do it to me." What would Jesus think of balancing the State's budget on the dollars of these poor women?

And when I think about the thousands of "video slot machines" that are spread across the state, I think of a middle-class family I know where a wonderful parent became addicted to video machine gambling—the "crack cocaine of gambling"—and in a few months, lost tens of thousands of dollars. (The speed and ease of play of video slots rapidly accelerates the addiction process for vulnerable individuals.)

This, I thought, is how a building in some politician's home town will be financed—on the back of a family's crisis of addiction and suffering.

I do not want to be misunderstood. In no way do I condemn gambling *per se*. People should be able to gamble legally, it seems to me—but only if we devise and put in place a system that contains effective, proven structural checks and safeguards that will minimize the terrible problems and harms associated with legalized gambling.

---

1. These conservative figures come from a number of national and state studies. The *Louisville Courier-Journal* did a series in December of 2002 that brings together some of the most compelling facts. *See www.courier-journal.com.* There seems to be a consensus that the State of Oregon, which has also hitched its public budget to gambling revenues, is a leader in measuring and offering treatment to problem gamblers. A well-documented report on problem and pathological gambling in Oregon, published by the Oregon Department of Human Services, is titled "Gambling Treatment Programs: Evaluation Update 2002," and can be found at *http://www.dhs.state.or.us/addiction/publications/gambling/2002ann summ.pdf.*

It appears to me, however, that the system that the Legislature has created—massive, statewide, convenience gambling—is pretty much the exact opposite of a sound approach.

In West Virginia—instead of conducting gambling in a limited number of publicly managed and overseen sites, where the problems of addictive, compulsive, pathological, and excessive gambling can be avoided, identified, and responded to—the Legislature has proliferated the most fiscally regressive and psychologically dangerous gambling devices, like instant lottery and video slot machines—in thousands of decentralized, privately managed sites, where *all of the financial incentives are to maximize revenue, and to ignore problem and pathological gambling.*

Furthermore, the Legislature does not even allow gamblers to have the best chance of success, or at least to prolong their entertainment as they lose their money. Instead, the Legislature sets high odds against gamblers (much higher than Las Vegas). Then, the massive gambling revenues, well above the costs of doing business, are treated as a "cash cow" for our government, which becomes dependent upon these revenues. *The Legislature is even issuing bonds that must be paid from money taken from our State's children decades from now, when they become gamblers.*[2] Talk about a credit-card government!

To me, this is a dismal situation. For these reasons, I personally question the wisdom of the course that the Legislature has chosen.

---

**2.** I recognize that the gambling system that the Legislature has created, and the money that this system collects from gamblers (both problem and non-problem), provide jobs for many people. This fact, made much of in the briefs in this case, is not rocket science. Money coming out of gamblers' pockets is obviously going into other peoples' pockets, directly and indirectly—where else would it go?

I also recognize that the members of the Legislature are strongly motivated by the goal of creating and supporting jobs—jobs for people who work in connection with gambling operations, and jobs for people who work for government, too.

But I don't think that the human and social costs of the current system have been weighed

*Conclusion*

If I disagreed professionally with the legal conclusion and result reached by the majority opinion, I would write a dissent. However, my disagreement, as noted, is based on my deeply-felt but essentially personal misgivings about the Legislative decisions that we are reviewing.

Accordingly, I have written not a dissent—but a lament.

ALBRIGHT, Justice, concurring.

I write separately to make two points.

First, I do not believe that a "lottery" is fully described by syllabus point one, *State ex rel. Mountaineer Park v. Polan,* or syllabus point four, *State v. Hudson,* adopted as syllabus points six and seven in the Court's opinion in the case *sub judice.* I believe that the critical question for decision in the instant proceeding was whether a state "lottery," as authorized by the state's constitution, could be conducted electronically in the myriad ways provided by so-called video poker machines. In view of the determination by the Legislature that such electronic devices qualify as a lottery under the constitution and our duty to exercise due restraint, indulge every reasonable construction and resolve any reasonable doubt in favor of the constitutionality of a legislative enactment, I believe it was necessary for this Court to uphold the video lottery law. Moreover, the rapid development of electronic commerce by which many things formerly conducted on paper are now accomplished electronically commended the Legislature's action to our favorable consideration.

against these job-related benefits. I question whether there will *ever* be a fair appreciation and weighing of the true costs of massive, statewide, convenience gambling. Rather, I foresee that dependence on gambling for state revenues will blind our leaders, who seem to be ever fearful of raising revenues by general taxation and fees, from recognizing and evaluating the human and social cost of the system they have created to obtain money from gamblers. And of course, a portion of the massive revenues that are also going in the pockets of the private gambling operators who manage the system the Legislature has set up will inevitably return to influence the political process—in ways that I frankly would rather not think about.

Second, while this Court has declined to find the video lottery constitutionally impermissible, that should not be seen as an endorsement by this author of the manner in which the system has been permitted to develop statewide. The specter of video coffee houses and other video poker outlets, sometimes it seems on every street corner, and widespread and rather unseemly advertising of the availability of video lottery demeans the state and our people. It is my earnest hope that the authorities responsible for the administration of this system will rigorously restrain the exposure of our people and our state to the appearance that the state has become one huge gambling hall.