PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WV ASSOCIATION OF CLUB
OWNERS AND FRATERNAL SERVICES,
INCORPORATED,

*Plaintiff-Appellee,*

v.

JOHN C. MUSGRAVE, in his official
capacity as Director of the State
Lottery,

*Defendant-Appellant,*

and

WEST VIRGINIA LOTTERY
COMMISSION,

*Defendant.*

No. 07-2032

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph R. Goodwin, Chief District Judge.
(2:07-cv-00122)

Argued: October 29, 2008

Decided: January 13, 2009

Before WILKINSON and DUNCAN, Circuit Judges,
and Richard D. BENNETT, United States District Judge for
the District of Maryland, sitting by designation.

Reversed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Bennett joined.

---

## COUNSEL

**ARGUED:** Katherine Ann Schultz, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant. Terri S. Baur, AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA, Charleston, West Virginia, for Appellee. **ON BRIEF:** Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant. Roger D. Forman, FORMAN & HUBER, L.C., Charleston, West Virginia, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Plaintiff, the West Virginia Association of Club Owners and Fraternal Services, Inc., brought this suit on behalf of its members which include certain clubs, restaurants, convenience stores, and fraternal organizations with alcohol licenses who are also state-licensed limited video lottery retailers. Plaintiff sought invalidation of West Virginia's restrictions on limited video lottery advertising as a violation of the First and Fourteenth Amendments of the United States Constitution. The district court granted plaintiff's motion for a preliminary injunction and enjoined enforcement of the advertising restrictions in all of their applications.

On the circumstances presented here, we must reverse. The Supreme Court has cautioned that we not casually invalidate state legislation on facial grounds, *see Washington State*

*Grange v. Washington State Republican Party*, ___ U.S. ___, 128 S.Ct. 1184 (2008), for the simple reason that such challenges "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint." *Id.* at 1191. In this particular context, we think that caution is especially advisable. The state has a longstanding and substantial interest in regulating the implementation and promotion of its own lottery. It has done so by attempting to raise revenues necessary for education and infrastructure without magnifying the social maladies often associated with gambling addictions. It is this interest in a balanced approach to lottery promotion that would be eviscerated by the wholesale invalidation of West Virginia's advertising restrictions.

## I.

## A.

West Virginia has a long history of regulating lotteries within its borders. From the time the state first entered the Union in 1863, up until 1984, the West Virginia Constitution banned all lotteries. In 1984, the Constitution was amended to create a narrow exception to the ban. As amended, Article VI, § 36 of the West Virginia Constitution provides:

> "The legislature shall have no power to authorize lotteries . . . for any purpose, and shall pass laws to prohibit the sale of lottery . . . tickets in this State; except that the legislature may authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law . . ."

W. Va. Const. Art. VI, § 36. Soon after the amendment was ratified, the West Virginia legislature passed the State Lottery Act, W. Va. Code § 29-22-1 *et seq.*, which created a Lottery Commission to conduct a state lottery to raise revenue for the state. Over time, the lottery expanded, but West Virginia

courts ensured that all lotteries within the state were authorized, "regulated, controlled, owned, and operated" by the state in accordance with the West Virginia Constitution. *See Club Ass'n of W. Va., Inc. v. Wise (Club Ass'n I)*, 156 F. Supp. 2d 599, 604-09 (S.D.W.Va. 2001).

This case concerns West Virginia's limited video lottery. Video lottery machines were first allowed by the Lottery Commission at a racetrack that entered into a contract with the Commission to operate privately owned video lottery machines. The West Virginia Supreme Court of Appeals invalidated this video lottery as violating W. Va. Const. Art. VI, § 36 because it was not specifically authorized by the state. *See W. Va. ex rel. Mountaineer Park, Inc. v. Polan*, 438 S.E.2d 308, 318 (W. Va. 1993). In response, the state legislature passed the Racetrack Video Lottery Act (the "RVLA"), W. Va. Code §§ 29-22A-1 *et seq.*, in 1994 to legalize video lotteries at racetracks in an effort to save the ailing racing industry and the jobs and tourism revenues that it provided for the state. *See* W. Va. Code § 29-22A-2(e).

At the same time, thousands of video gaming machines were being operated illegally in private establishments other than racetracks. These "gray" machines went largely unregulated because they were only *prima facie* illegal and consequently it was difficult to enforce the restrictions against them. According to a government commissioned report, the number of illegal "gray" machines reached 13,524 by 2001. To combat the problem of "gray" machines and to capitalize on video lottery revenues at a time of budgetary pressure, Governor Robert Wise proposed legalizing, restricting, and regulating video gaming machines in his 2001 State of the State Address. He specifically wanted to use video lottery revenues to fund education and infrastructure in West Virginia. Following the Governor's suggestion, and after extensive debate, the legislature passed the Limited Video Lottery Act (the "LVLA"), W. Va. Code §§ 29-22B-101 *et seq.*, in April

2001 during a special session. *See Club Ass'n I*, 156 F. Supp. 2d at 606-08 (detailing history).

The LVLA raises revenue for the state. Based on a sliding scale determined by daily revenues, the LVLA allocates thirty to fifty percent of gross profits to the Lottery Commission for distribution to municipalities and the State Excess Lottery Revenue Fund. *See* W. Va. Code § 29-22B-1408. The LVLA also distributes two percent of gross terminal income to the Lottery Commission for its costs. *See* W. Va. Code § 29-22B-1408(a)(1). A portion of this two percent goes directly to the compulsive gambling treatment fund created by the state. *Id.* In fiscal year 2004, the state received almost $242 million in revenue from the limited video lottery. 512 F. Supp. 2d at 435.

The LVLA legalizes and regulates the video lottery by providing a licensing scheme for video lottery machines that is administered by the Lottery Commission. *See* W. Va. Code § 29-22B-402. A brief overview of the LVLA demonstrates that it closely regulates the video lottery. First, it allows the Lottery Commission to distribute non-transferable licenses for only 9,000 terminals for use in restricted access adult-only facilities, W. Va. Code § 29-22B-1101(a), *id.* at § 29-22B-203(2); it allows individual retailers to have only five video lottery terminals on their premises, *id.* at § 29-22B-1101(c); and it prohibits two retailers from locating in the same building or within 150 feet of each other, *id.* at § 29-22B-1202.[1] The LVLA also requires retailers to provide phone numbers for state-approved providers of gambling treatment and support services, and to post a sign that reads: "CAUTION: Gambling and playing this machine can be hazardous to your health, your finances, and your future." *Id.* at § 29-22B-1112. Additionally, the Act prohibits retailers from providing access

---

[1]There are minor exceptions to these provisions for certain non-profit, fraternal, and veteran's organizations. *See* § 29-22B-1101(c); *id.* at § 29-22B-1202(b).

to ATMs and from accepting credit cards or debit cards as payment for playing the video lottery machine. *Id.* at § 29-22B-702(10). Finally, the LVLA prohibits people under twenty-one years old from playing the video lottery machines and subjects retailers to civil penalties if they allow underage participation. *Id.* at § 29-22B-1602(a) to (b).

The LVLA also attempts to curb the use of illegal "gray" video lottery machines by making restrictions on video gambling machines easier to enforce than they previously were. The LVLA makes unlicensed video gambling machines *per se* illegal, subject to seizure, and subject to criminal penalties. *See* W. Va. Code § 29-22B-1801; *id.* at § 29-22B-1703 to -1705.

In addition, and similar to the RVLA, the LVLA provides specific legislative findings that the limited video lottery is a "lottery" within the meaning of W. Va. Const. Art. VI, § 36 and that the state has constitutional authority to establish a lottery that is "regulated, controlled, owned and operated" by the state. *See* W. Va. Code § 29-22B-201. The legislative findings declare that the state can "control, own and operate a video lottery by possessing a proprietary interest in the main logic boards . . . memory chips . . . and software . . . necessary for the video lottery system to be operated."[2] *Id.* at § 29-22B-

---

[2]The legislative findings further provide that (2) the state "may possess a proprietary interest in video lottery game software, for purposes of this article, through outright ownership or through an exclusive product license agreement with a manufacturer whereby (A) the manufacturer retains copyrighted ownership of the software, (B) the product license granted to the state is nontransferable, and (C) the agreement authorizes the state to run the software program, solely for its own use, on the state's central equipment unit and electronic video terminals networked to the central equipment unit;" and (3) the state "can control and regulate a video lottery if the state (A) restricts licensure to a limited number of video lottery terminals at qualified locations, (B) extends strict and exclusive state regulation to all persons, locations, practices and associations related to the operation of licensed limited video lottery facilities, and (C) provides comprehensive law-enforcement supervision of limited video lottery activities." W. Va. Code § 29-22B-202.

202(1). Based on these legislative findings, the West Virginia Supreme Court of Appeals held that both the RVLA and LVLA satisfy the state ownership and control requirements of W. Va. Const. Art. VI, § 36. *See West Virginia ex rel. Cities of Charleston and Huntington v. West Virginia Economic Development Authority*, 588 S.E.2d 655, 670 (W. Va. 2003).

The RVLA and LVLA differ on the important matter at issue in this case: the LVLA regulates video lottery advertising more strictly than the RVLA does.[3] The LVLA prohibits the Lottery Commission and limited video lottery retailers from conducting "video lottery advertising or promotional activities." *See* W. Va. Code § 29-22B-702(13); *id.* at § 29-22B-404; *see also* W. Va. Code R. § 179-5-33.2; *id.* at § 179-5-33.1 (prohibiting licensed operators from advertising). Advertising is defined as "a media advertisement, an outdoor sign, or a sign inside the licensee's premises that may be seen from the outside of the premises, that conveys to the average reader or hearer that limited video lottery gaming is available at the retail establishment or from the licensed operator." W. Va. Code R. § 179-5-2.1. The LVLA further prohibits the use of "the words 'video lottery' in the name of the approved location, or in any directions or advertising visible from outside the retailer's establishment." *See* W. Va. Code § 29-22B-702(14); *see also* W. Va. Code R. § 179-5-33.3. Rules promulgated under the LVLA also prohibit limited video lottery retailers from using words "commonly associated with gambling" in their names, W. Va. Code R. § 179-5-33.4, and from using "gambling symbols . . . on any sign or in any directions or advertising visible from outside the licensed retailer's establishment," *id.* at § 179-5-33.5. The rules do permit retailers to display a 12 inch by 12 inch uniform sign, distributed by the Lottery Commission, which states "West Virginia Lot-

---

[3]The RVLA provides that a racetrack can advertise its video lottery if it receives prior written approval of the director of the Lottery Commission. *See* W. Va. Code § 29-22A-9(f)(12).

tery Products available here." *See* W. Va. Code R. § 179-5-33.2.

### B.

The West Virginia Association of Club Owners and Fraternal Services, Inc. filed this suit on behalf of its members on February 27, 2007, to challenge the limited video lottery advertising restrictions. Plaintiff filed a complaint seeking declaratory and injunctive relief, and a motion for a preliminary injunction against the West Virginia State Lottery Commission and John C. Musgrave in his official capacity as Director of the State Lottery. Plaintiff claims that the restrictions on advertising contained in the LVLA and the Limited Video Lottery Rules violate plaintiff's right to free speech under the First and Fourteenth Amendments of the United States Constitution and under Article III, § 7 of the West Virginia Constitution.[4] The Lottery Commission was subsequently dismissed from the suit.

The district court granted plaintiff's motion for a preliminary injunction. The court held that plaintiff had established a likelihood of success on the merits of plaintiff's federal constitutional claims. The court reasoned that it was likely that the speech being regulated was private speech by limited video lottery retailers and that the advertising regulations impermissibly restricted the retailers' right to engage in commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). The court held that the other preliminary injunction requirements were met and therefore enjoined the defendant from enforcing any of its advertising restrictions.[5] *See West*

---

[4]The district court did not rule on the West Virginia constitutional claims.

[5]The district court opinion only specifically lists "the advertising ban contained in West Virginia Code § 29-22B-702(13) and (14) and West Virginia Code of State Rules § 179-5-33.1 to 4" as enjoined. 512 F. Supp.

*Virginia Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave*, 512 F. Supp. 2d 424 (S.D.W.Va. 2007). Defendant appeals. A panel of this court granted defendant's motion for a stay pending this appeal. *See* Order, November 26, 2007.

We review the district court's grant of a preliminary injunction for abuse of discretion. Accordingly, we review factual findings for clear error and legal conclusions *de novo. See East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004). In order to receive a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, ___ U.S. ___, slip op. at 10 (2008). As the district court noted, in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is "inseparably linked" to the likelihood of success on the merits of plaintiff's First Amendment claim. 512 F. Supp. 2d at 429. *See also Newsom v. Albemarle County School Bd.*, 354 F.3d 249, 254-55 (4th Cir. 2003). Therefore, we focus our review on the merits of plaintiff's First Amendment claim.

## II.

West Virginia contends that the speech being regulated— limited video lottery advertising—is government speech and

2d at 448. However, plaintiff also included W. Va. Code R. § 179-5-33.5 in its complaint and the district court noted that "when I discuss the State's limitations on advertising, I am referring to the statutory prohibitions on advertising in W. Va. Code § 29-22B-702 and the limitations on the actions of LVL retailers contained in W. Va. Code R. § 179-5-33.1 to -33.5," *id.* at 430 n.3, and did not distinguish § 179-5-33.5 in its application of *Central Hudson* to the advertising restrictions. We therefore take the district court to also enjoin W. Va. Code R. § 179-5-33.5, the prohibition on the use of gambling symbols.

therefore can be restricted by the government free from First Amendment scrutiny. Plaintiff contends that the speech at issue is private speech by the limited video lottery retailers and therefore can only be restricted in accordance with the First Amendment. The speech at issue does not fit neatly into either category: it is hybrid speech. As this court recognized in *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004), some speech is "mixed" speech because it has aspects of both private speech and government speech. *Id.* at 794. To say it is all one or the other is to over-simplify.

Some aspects of the limited video lottery advertising suggest that it is government speech. First, the government is conveying a message, which is a prerequisite to a finding of government speech. By requiring that the lottery only be advertised through uniform signs and by prohibiting all other advertisements, the state is conveying a message supporting measured use of the video lottery. The district court erred when it rejected this as a message because, in its view, any message was "mixed at best." 512 F. Supp. 2d at 436. Here, however, the government is not conveying a mixed or inconsistent message—it is conveying a message of balance.

For this reason, a similar argument was rejected in *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), where the Court stated: "[t]he beef promotions are perfectly compatible with the [government dietary] guidelines' message of moderate consumption — the ads do not insist that beef is also What's for Breakfast, Lunch, and Midnight Snack." *Id.* at 561 n.5. Likewise, here the uniform advertisements convey a message of "moderate consumption" rather than an inducement to overindulgence that might result if advertisers were given free rein. We also reject plaintiff's argument that the state was not conveying a message because defendant conceded in a memorandum to the district court that it "has not taken any action to promote an anti-gambling position." *See* Plaintiff's Brief at 10-11. The state's message is not an anti-

gambling message—it is a message of permitting gambling within bounds.

The state is politically accountable for this message because it conducts the video lottery program. The fact that the state is conveying a message for which it is politically accountable suggests that the speech at issue is government speech. *See, e.g.*, *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217, 235 (2000) ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy."). This rationale can apply even when the government "use[s] private speakers to transmit specific information pertaining to its own program." *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).

However, the fact that the government is conveying a message does not automatically qualify that message as government speech. It is also relevant whether the government is conveying its message by restricting its own speech or by restricting private speech. On the one hand, the speech being restricted here is government speech because it falls within the scope of the video lottery program. That program is one in which the state has a significant revenue interest, W. Va. Code at § 29-22B-1408, maintains the central equipment, *id.* at § 29-22B-305, has a proprietary interest in the software, *id.* at § 29-22B-202, and has been found by the state's highest court to satisfy the West Virginia constitutional requirements of state ownership and control. *See West Virginia Economic Development Authority*, 588 S.E.2d at 670. Therefore, in one sense, all speech by retailers that advertises the video lottery is within the scope of the video lottery program and the owner-licensee relationship because it relates directly to the use of the video lottery. *See Garcetti v. Ceballos*, 547 U.S. 410, 421-23 (2006) (holding that speech made by government employee pursuant to official duties is government speech); *Rust v. Sullivan*, 500 U.S. 173, 194-200 (1991) (upholding

restrictions on speech made within limits of government program).

The speech being restricted also has attributes of private speech. It is privately funded, which distinguishes it from the publicly funded speech at issue in *Rust* and *Garcetti*.[6] Moreover, the retailers are the literal speakers — they would design the advertisements, they would display the advertisements, and they own the retail outlets as well as the state-licensed video gaming machines. Prior government speech cases have identified these factors as supporting a finding of private speech. *See Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles*, 288 F.3d 610, 618 (4th Cir. 2002) ("the identity of the 'literal speaker'" is one of four factors to determine the government or private nature of speech); *Rose*, 361 F.3d at 792-93 (same). These private speech attributes suggest that the government is not only affirmatively speaking, or even just restricting its own speech, but instead is trying to convey its message through private speakers that it did not fund or provide with a means of communication. For these reasons, we cannot designate the speech at issue as pure government speech.

In sum, the speech at issue in this case shares some aspects of government speech and some aspects of private speech. For that reason, neat categorizations cannot alone resolve the questions and the parties are wrong to suggest that they can. But regardless of where the speech may fall on the government/private speech spectrum, a challenge brought to enjoin large swaths of a comprehensive regulatory scheme is something a court should consider with caution—"[f]acial invalidation is, manifestly, strong medicine," and such challenges are

---

[6]This case also differs from *Summum v. Pleasant Grove City*, 483 F.3d 1044 (10th Cir. 2007), because the tension between the free speech clause and the establishment clause of the First Amendment is simply absent here.

disfavored. *See National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotations omitted).[7]

### III.

Plaintiff asks the court to declare the advertising restrictions "unconstitutional, illegal, and void" under *Central Hudson* and seeks to enjoin enforcement of each of the statutes and regulations in all of their potential applications against plaintiff's members. *See* Plaintiff's Complaint at 5. Plaintiff asks too much. While one can always quibble over terminology, most of the disadvantages of facial challenges are present here. Plaintiff did not bring this challenge in the context of a specific enforcement action and, more critically, its meat-axe approach has deprived the court of the contextual underpinning that normally informs judicial consideration of statutory and regulatory applications.

Instead, plaintiff seeks an unrestricted right to advertise. Plaintiff therefore asks us to evaluate claims based on speculation and to "formulate a rule of constitutional law broader than [might be] required by the precise facts to which it is to be applied." *Washington State Grange v. Washington State Republican Party*, ___ U.S. ___, 128 S.Ct. 1184, 1191 (2008) (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936)). Despite plaintiff's claim that it seeks a limited right to engage in truthful advertising, *see* Plaintiff's Brief at 1, plaintiff asked the district court to "enjoin[ ] the Director from enforcing the state's ban on advertising and promotions against plaintiff's members," without restriction. *See* Plaintiff's Complaint at 5. And the district court granted a blanket injunction

---

[7]Our analysis would have been better served if West Virginia, instead of relying solely on its argument regarding government speech, had appealed the district court's ruling that West Virginia's restrictions on advertising did not pass the intermediate scrutiny test articulated in *Central Hudson*. We are, however, compelled to discuss the *Central Hudson* standard because the hybrid nature of the speech presented necessarily calls it into play.

preventing defendant from enforcing *any* of the advertising prohibitions. *See* 512 F. Supp. 2d at 448. Plaintiff was thereby permitted to take a whack at the state's comprehensive regulatory scheme and disembody it in one fell swoop. But the Supreme Court recently reminded in *Washington State Grange*, that "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" 128 S.Ct. at 1191 (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)).

We thus think the course of prudence lies in avoiding wholesale interference with a program at the core of state expertise and interest. Whether a particular regulation or application is in some sense infirm is not something we need to ask. This is a question for the future. For as the Court said, "[a]s-applied challenges are the basic building blocks of constitutional adjudication," *see Gonzales v. Carhart*, 127 S.Ct. 1610, 1639 (2007) (quoting Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1328 (2000)), and "[a]lthough passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular," *see Sabri v. United States*, 541 U.S. 600, 608-09 (2004). For these reasons, we hesitate to throw out rules and statutory prohibitions that are carefully threaded throughout a comprehensive state regulatory scheme.

This general perspective — recognizing the inadvisability of dispatching regulatory regimes wholesale — makes application of the Supreme Court's analysis in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), more straightforward. Our analysis is limited to the narrow category of cases where the challenged regulations only restrict promotion of a government-

created product. The speech at issue lies at the intersection of government speech, which is unprotected by the First Amendment, and private commercial speech, which is deserving of a real but still "lesser protection" under the First Amendment. *See Johanns*, 544 U.S. at 553; *Central Hudson*, 447 U.S. at 563. The regulations do not inhibit the ability of people to engage in political speech about government programs—everyone is still free to debate the merits and demerits of the lottery to a fare-thee-well. The regulations also do not prevent private entities from advertising purely private products; the context therefore differs from the *Central Hudson* line of cases. In this case, the state's interest is higher because the state has an ownership interest, not just a regulatory interest, in the video lottery. We continue to use *Central Hudson* as a guide, but we note that in this narrow circumstance the government speech aspects of the commercial speech at issue provide additional weight in favor of upholding the state's regulations that is simply not present in other commercial speech cases.

We recognize of course the importance of commercial speech—it "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson*, 447 U.S. at 561-62. Given the important informational value of commercial speech, the Court has articulated a four-part intermediate scrutiny test to determine the constitutionality of restrictions on commercial speech: (1) to receive any First Amendment protection, commercial speech "must concern lawful activity and not be misleading;" (2) the government must assert a "substantial" government interest to justify its regulation; (3) the regulation must "directly advance[ ] the governmental interest asserted;" and (4) the regulation must not be "more extensive than is necessary to serve that interest." *Id.* at 566. The Court later explained, "[t]he four parts of the *Central Hudson* test are not entirely discrete. All are important and, to a certain extent, interrelated: Each raises a relevant question that may not be disposi-

tive to the First Amendment inquiry, but the answer to which may inform a judgment concerning the other three." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 183-84 (1999).

### A.

First, the speech at issue in this case — limited video lottery advertising — concerns a lawful activity and we shall assume that it is not misleading. The speech relates to the video lottery which was legalized by the LVLA in 2001. *See* W. Va. Code §§ 29-22B-101 *et seq.* We assume that the speech is not misleading because, as the district court found, the speech is not inherently misleading, defendant has not provided evidence that the speech is actually misleading, and there is no evidence that the advertising restrictions were enacted to prevent the dissemination of misleading information. 512 F. Supp. 2d at 440-41. However, the fact that we are required to make this assumption is a drawback to facial invalidation. We have no idea whether the advertisements will be misleading. Plaintiff asks us to rely on speculation about the informational value of potential advertisements to enjoin enforcement of the restrictions against *all* advertisements. To rely on such speculation would not be prudent and so we again proceed with caution.

### B.

Second, the government has a substantial interest in conducting a lottery program that raises revenue for the state but remains moderate in nature and balanced in its essence. The state's asserted interest is to advance the purposes of the LVLA. As the district court noted, "[t]he avowed purpose of [the LVLA] was to establish a single state owned and regulated video lottery thus allowing the State to collect revenue therefrom, control the operators of the machines, and stem the proliferation of gambling in the State." 512 F. Supp. 2d at 427 (quoting *Club Ass'n v. Wise*, 293 F.3d 723, 724 (4th Cir.

2002)); *see also West Virginia Economic Development Authority*, 588 S.E.2d at 667.

The history of the LVLA supports this purpose. In 2001, Governor Wise initially proposed legalizing the video lottery in order to "reduce, restrict, and regulate" the over 13,000 illegal "gray" machines available in private establishments and to generate revenue to finance education and infrastructure projects in West Virginia. *See Club Ass'n I*, 156 F. Supp. 2d at 607 (quoting Governor Wise). By legalizing a limited video lottery, the state sought to bring video gambling out into the open so that it could better enforce regulations that prevent the social ills associated with gambling while not relinquishing its revenue-generating benefits.

The district court erred in considering the state interests as distinct purposes when in fact they are an interrelated whole. 512 F. Supp. 2d at 442. When considered in its entirety, the LVLA has the perfectly coherent goal of creating a lottery that raises revenue without preying on the vulnerabilities of the impecunious and those prone to gambling addictions.

The state's interest in conducting the lottery also falls squarely within the state's historic interest in regulating gambling pursuant to the state police power. It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme. In the commercial speech context specifically, the Court has consistently recognized that governments have a substantial interest in reducing the negative effects of gambling. *See Greater New Orleans Broadcasting*, 527 U.S. at 185 ("reducing the social costs associated with 'gambling' or 'casino gambling'" is a substantial interest); *Posadas de Puerto Rico Associates v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986) (reducing demand for casino gambling in order to prevent harmful effects on the health, safety, and welfare of citizens is a substantial interest).

It matters, therefore, that West Virginia has decided to permit only lotteries that are "regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law." W. Va. Const. Art. VI, § 36; *see also West Virginia Economic Development Authority*, 588 S.E.2d at 670. The state constitutional mandate reflects the state's conclusion that a purely private lottery driven by profit would not be beneficial, but a state-run lottery that balances the positive and negative effects of gambling would be. The LVLA thus aims to raise revenue, but not at all costs. Instead, West Virginia seeks quite legitimately to have the best of both worlds by limiting the scope of the lottery through a licensing scheme that includes the various advertising regulations at issue here.

It is this balance that plaintiff seeks to upset by eliminating a crucial part of the program. To be sure, a broad-brush invalidation of the advertising rules might stimulate more enticing signage and hence raise more revenue, but it would literally destroy the balance at the heart of the state-created program. The consequences of facial invalidation of West Virginia's advertising restrictions would thus be staggering. Other states have lotteries similar to West Virginia's—they too seek to raise revenue, but not to an extent that causes gambling to proliferate in a manner that exacerbates serious social problems.

## C.

Third, the advertising restrictions must "directly and materially advance[ ] the asserted governmental interest." *Greater New Orleans Broadcasting*, 527 U.S. at 188. "'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Id.* (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)). The Court later explained: "We do not, however, require that 'empirical data come . . . accompanied by a sur-

feit of background information . . . . [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (internal citations omitted). Accordingly, we do not simply defer to defendant's contention because it is a legislative judgment. *See Anheuser-Busch v. Schmoke (Anheuser-Busch II)*, 101 F.3d 325, 327 n.1 (4th Cir. 1996). Instead, we independently evaluate defendant's assertion that the advertising restrictions advance the state's interest, and we rely on the valid sources of history, consensus, and common sense.

Much of what was said in the preceding section pertains to this prong of the inquiry as well. In many interrelated ways, the advertising restrictions serve the state's interest in conducting its video lottery in a manner that raises revenue but avoids amplifying the social ills associated with gambling. The advertising restrictions prevent retailers from having names, signs, and advertisements that might prey on those prone to gambling addiction. The restrictions also limit the spread of the private establishment video lottery and reduce demand for it.

In contrast, an unlimited right to advertise video lotteries poses the risk of spreading the negative effects of lotteries throughout the state. This potential expansion is why the state treats the racetrack video lottery differently from the private establishment video lottery. *Compare* W. Va. Code § 29-22A-9(f)(12) (allowing government approved advertisements for the racetrack video lottery) *and id.* at § 29-22B-702(13) (prohibiting advertisements for the private establishment video lottery). Racetracks are limited in number and location. They are inherently linked to gambling; indeed that explains the presence of many of the patrons there. The history of the RVLA and LVLA suggests that the state had different purposes in mind when it legalized the two video lotteries. The

RVLA was enacted to preserve the racetrack industry and the jobs and state tourism revenue that go along with it. *See id.* at § 29-22A-2(e). In contrast, the LVLA was enacted to get control of the thousands of illegal "gray" machines throughout the state and to raise revenue in a more tempered way. The comprehensive scheme for lottery advertising in West Virginia reflects the differences in the types of lotteries involved. In so doing, it directly serves the state's interest in a modulated approach to the area of gambling.[8]

The advertising restrictions also serve the state's interest by reducing demand for the video lottery in private establishments. Of course this makes perfect sense. If advertising did not increase demand, commercial establishments would be loathe to pay for it. This very linkage between advertising and demand led the Court to recognize that in some instances a reduction in advertising could directly advance the government's interest in reducing demand for a product. *See Lorillard Tobacco*, 533 U.S. at 557, 561 (holding that advertising restriction on tobacco products advances government interest and collecting cases "acknowledg[ing] the theory that product advertising stimulates demand for products, while suppressed advertising may have the opposite effect"). This is one such instance. Here the state's interest would be difficult if not impossible to achieve without some reduction in demand — indeed the promotions restrictions are precisely designed to keep demand at a level that raises revenue, but does not magnify the more negative effects of increased gambling.

---

[8]The West Virginia Code of State Rules also provides: "Nothing contained in this section prohibits the advertising on radio and television of scratch off 'instant' lottery games, online numbers games such as powerball, racetrack video lottery games or new lottery games other than limited video lottery games." W. Va. Code R. § 179-5-33.6. Racetrack gambling is treated differently than the video lottery for the reasons discussed, and the qualitative difference is apparent between video lottery games and other games such as powerball and instant scratch-off lottery games.

To be sure, the linkage between advertising and demand is not enough to save a restriction of commercial speech in every instance. The Court has struck down restrictions in cases where the program is irrational, *see Greater New Orleans Broadcasting*, 527 U.S. at 190; *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995), or where there is specific evidence that goes against the claimed linkage, *see 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 506 & n.17 (1996) (Stevens, J., concurring); *Edenfield*, 507 U.S. at 771-73. But these infirmities are not present in this case. Here, the state has enacted a comprehensive licensing scheme to conduct a state-created program. Moreover, facial invalidation of an array of regulations is bound to implicate the linkage between advertising and demand to the greatest possible extent — even to the point of raising demand to a degree that would damage the balance that underlies the program.

Given the ways that the restrictions advance the state's interest, we cannot say that the link between the advertising restrictions and the state's interest fails because it is "mere speculation or conjecture." *See Edenfield*, 507 U.S. at 770. To the contrary, the link is supported by "history, consensus, and 'simple common sense.'" *See Lorillard Tobacco*, 533 U.S. at 555 (internal citations omitted). Invalidation of the large range of regulations that plaintiff challenges is not only subversive of the state's interest but of the means that directly and substantially advance that interest. In other words, the breadth of the invalidation here dismembers the state's lottery program from stem to stern.

### D.

Finally, the restrictions must not be more extensive than necessary. While the restrictions do not need to be the "least restrictive means conceivable," they do need to have a "reasonable" fit with the government's interest — a fit "that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Greater New*

*Orleans Broadcasting*, 527 U.S. at 188 (quoting *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 480 (1989)). Accordingly, the government must consider alternatives to regulating speech to achieve its ends. In this regard, any commercial speech restrictions must be "a necessary as opposed to merely convenient means of achieving [the government's] interests. . . . regulating speech must be a last — not first — resort." *Thompson v. Western States Medical Center*, 535 U.S. 357, 373 (2002). The scope of the restriction is permissible, however, if the government "'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." *Greater New Orleans Broadcasting*, 527 U.S. at 188 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417, (1993)); *Lorillard Tobacco*, 533 U.S. at 561.

We do not believe the fourth prong of the *Central Hudson* inquiry requires these regulations to be struck as facially infirm. The Court's case in *Greater New Orleans Broadcasting* is instructive. There, the Court held that a federal prohibition on broadcast advertisements of private casino gambling was unconstitutional as applied to radio and television stations located in Louisiana where private casino gambling was legal. 527 U.S. at 176. The Court reasoned that the prohibition failed the *Central Hudson* test because, among other things, Congress's failure to directly regulate private casinos through "practical and nonspeech-related forms of regulation" undermined the government's asserted justifications for the advertising prohibition. *Greater New Orleans Broadcasting*, 527 U.S. at 192. Just as in *Coors Brewing*, the government did not enact obvious conduct regulations "which could advance the asserted interests 'in a manner less intrusive to [petitioners'] First Amendment rights.'" *Id.* at 193 (quoting *Coors Brewing*, 514 U.S. at 490-91). *See also Thompson*, 535 U.S. at 372-73 (striking down restriction where "there is no hint that the Government even considered" directly regulating conduct to achieve its interest).

Here, by contrast, West Virginia directly regulates *the conduct* of video lottery retailers in many ways. The LVLA restricts the total number of video lottery terminals. *See* W. Va. Code § 29-22B-1101. It restricts the number of terminals that any one retailer can have. *Id.* And it restricts how close together video lottery retailers can locate. *Id.* at § 29-22B-1202. It prohibits people under twenty-one years old from playing the video lottery. *Id.* at § 29-22B-1602. It also prohibits retailers from providing access to an ATM and from accepting credit or debit cards. *Id.* at § 29-22B-702(10).

The state has taken advantage of virtually all of the non-speech alternatives suggested in other cases. *See Greater New Orleans Broadcasting*, 527 U.S. at 192 (suggesting "a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements—that could more directly and effectively alleviate some of the social costs of casino gambling"). The state has even gone beyond conducting an educational campaign as suggested in *44 Liquormart*, 517 U.S. at 507 (Stevens, J., concurring), by requiring that retailers display a caution sign directly on the video lottery machines. *See* W. Va. Code § 29-22B-1112. The LVLA also requires retailers to provide consumers with information about gambling treatment and support services, *id.*, and it provides funding for a compulsive gambling treatment fund, *id.* at § 29-22B-1408(a)(1).

The state has thus not only considered, but has implemented regulations that are alternatives to regulations on speech. But the state concluded, and we independently agree, that its objectives would be compromised if advertising for the video lottery contradicted, rather than supplemented, its conduct restrictions and educational initiatives. At least West Virginia might permissibly reason that its conduct restrictions and education initiatives might be undermined by flashing neon lights for video lotteries on the premises of retail establishments or other advertisements scratching too aggressively

the itch to "get rich." In the lottery context, the means are proportionately tailored to the state's plain objectives if they complement non-speech alternatives in a fashion that produces a coherent and comprehensive regulatory program.

The scope of the regulations is permissible because the state "carefully calculated" the costs and benefits of the regulations at issue. At the outset we noted that the government interest is stronger here, and the private interest is weaker, than in typical commercial speech cases because the state partially owns the lottery. The retailers therefore have less of an interest in "conveying truthful information about their products" than in the typical case because it is not entirely *their* product. *See Lorillard Tobacco*, 533 U.S. at 564. The augmented strength of the government's interest and the diminished strength of the retailers' interest weighs in favor of finding that the scope of the regulations does not "unduly impinge" on their rights, *id.* at 565, and is "in proportion to the interest served." *See Greater New Orleans Broadcasting*, 527 U.S. at 188 (quoting *Fox*, 492 U.S. at 480).

The fact that the state carefully considered the scope of its regulations is evidenced by the specific regulations the state enacted. The state prohibits retailers from video lottery advertising, W. Va. Code § 29-22B-702(13) and W. Va. Code R. § 179-5-33.2, and from using the words "video lottery" in their names, W. Va. Code § 29-22B-702(14) and W. Va. Code R. § 179-5-33.3, but permits retailers to display a uniform sign indicating that West Virginia lottery products are available, W. Va. Code R. § 179-5-33.2. This achieves the state's goal of balance: it informs consumers that lottery products are available, but it does not prey on vulnerable populations. The state also prohibits retailers from using "words commonly associated with gambling" in their names, *id.* at § 179-5-33.4, and from using "gambling symbols including but not limited to playing cards, roulette wheels, slot machines or dice" in advertising visible from outside of the retailer's establishment, *id.* at § 179-5-33.5. These restrictions

complement the state's restrictions on video lottery games themselves, which prohibit casino gambling themed games. *See* W. Va. Code § 29-22B-332(7).

Plaintiff seeks to have all of these restrictions throughout the program declared unconstitutional, but they are not susceptible to such sweeping rejection, for the scope of the regulations represents a comprehensive and "carefully calculated" effort by the state to achieve its interest in conducting a moderate video lottery without unduly restricting speech. The danger of getting too deep into the fourth *Central Hudson* prong of tailoring is that it enmeshes federal courts in a wealth of subsidiary lottery issues, which have historically been left to the state legislatures and agencies that create and implement these programs. Eventually, we would be asked to approve or disapprove very specific forms of advertising: colors and designs; sizes and location of signs and billboards; mediums of communication that are permissible and those that are not. Soon, we would become a quasi-lottery board ourselves. Such a searching inquiry is beyond our proper role as judges and would go against the Court's direction that "[t]he Government is not required [under *Central Hudson*] to employ the least restrictive means conceivable." *Greater New Orleans Broadcasting*, 527 U.S. at 188.

What we have before us at this time is an order enjoining each and every one of West Virginia's video lottery promotional regulations and, conversely, conveying on the plaintiffs an unrestricted right to advertise. The context of this case suggests the need for prudence, caution, and a respect for the entirety of the effort upon which the state of West Virginia has embarked. The effect of the preliminary injunction is to unwind the lottery program which relies on a public/private partnership and interrelated complementary features to achieve the objectives of revenue production, educational and infrastructure improvement, and promotion of the public welfare that lie at the heart of a state's role in our constitutional order. Because the preliminary injunction before us now is

inconsistent with these aims, it must be vacated and the judgment of the district court reversed.

*REVERSED*