**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 25-1012**

─────────────

RETAIL ENERGY ADVANCEMENT LEAGUE; GREEN MOUNTAIN
ENERGY COMPANY,

Plaintiffs - Appellants,

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland;
FREDERICK H. HOOVER, in his official capacity as Chair of the Maryland Public
Service Commission; MICHAEL T. RICHARD, in his official capacity as member
of the Maryland Public Service Commission; KUMAR P. BARVE, in his official
capacity as member of the Maryland Public Service Commission; BONNIE A.
SUCHMAN, in her official capacity as member of the Maryland Public Service
Commission,

Defendants - Appellees.

----------------------

STATE OF NORTH DAKOTA; STATE OF ALABAMA; STATE OF IDAHO;
STATE OF IOWA; STATE OF LOUISIANA; STATE OF MONTANA; STATE
OF NEBRASKA,

Amici Supporting Appellant.

─────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Julie R. Rubin, District Judge.  (1:24-cv-2820-JRR)

─────────────

Argued:  October 24, 2025                    Decided:  May 15, 2026

─────────────

Before DIAZ, Chief Circuit Judge, FLOYD, Senior Circuit Judge, and GILES, Patricia Tolliver, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Reversed in part and remanded with instructions by published opinion. Judge Floyd wrote the opinion in which Chief Judge Diaz and Judge Giles joined.

---

**ARGUED:** Thomas M. Johnson, Jr., WILEY REIN, LLP, Washington, D.C., for Appellants. James David Handley, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Stephen J. Obermeier, Jeremy J. Broggi, Krystal B. Swendsboe, Boyd Garriott, Joel S. Nolette, WILEY REIN, LLP, Washington, D.C., for Appellants. Anthony G. Brown, Attorney General, Howard R. Feldman, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee Anthony G. Brown. Miles H. Mitchell, General Counsel, Colin Glynn, Associate General Counsel, MARYLAND PUBLIC SERVICE COMMISSION, Baltimore, Maryland, for Appellees Frederick H. Hoover, Michael T. Richard, Kumar P. Barve, and Bonnie A. Suchman. Drew H. Wrigley, Attorney General, Philip Axt, Solicitor General, Joseph S. St. John, Special Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA, Bismarck, North Dakota, for Amicus State of North Dakota. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Brenna Bird, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa. Austin Knudsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana, for Amicus State of Montana. Raúl Labrador, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IDAHO, Boise, Idaho, for Amicus State of Idaho. Liz Murrill, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Michael T. Hilgers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska.

---

FLOYD, Senior Circuit Judge:

This appeal arises from a district court's refusal to preliminarily enjoin a Maryland law restricting and compelling the speech of renewable energy suppliers. Under the statute, suppliers advertising "green power" are prohibited from using certain descriptive terms when their product is not majority-backed by renewable energy credits, as defined by state law. Md. Pub. Util. § 7-707(c). The statute also requires these suppliers to include disclosures with information about the system of renewable energy credits. *Id.* § 7-707(f)(2)–(g). Plaintiffs-Appellants Retail Energy Advancement League and Green Mountain Energy Company (together, "Plaintiffs") sought to enjoin the statute. In evaluating their request for a preliminary injunction, the district court applied the Supreme Court's test under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and denied their motion. Because we find that Plaintiffs have established the requisite preliminary injunction factors as to their speech restriction challenge, we reverse in part. Regarding the statute's disclosure requirement, because the State has since promulgated new disclosure language, we remand the question of the constitutionality of this newly imposed compelled speech to the district court for initial review.

## I.

In 1999, Maryland's legislature passed the Electric Customer Choice and Competition Act (the "Choice Act"), which deregulated the state's electricity market. *See generally In re Smart Energy Holdings, LLC*, 311 A.3d 919, 515–23 (Md. 2024) (discussing the Choice Act and providing background on Maryland's statutory and

3

regulatory framework for consumer energy delivery).  Prior to this law's enactment, electric energy supply and distribution were bundled together and provided to customers by a single electric utility company.  Today, as a result of the Choice Act, Maryland consumers may select from a number of competing energy suppliers licensed by the state Public Service Commission (PSC).  In addition to the option to choose an energy supplier, consumers who do not wish to shop for their electricity supply can select a default "standard offer service" supply from their local utility.  *Id.* at 927 (quoting Pub. Util. § 7-506(e)).

In 2004, Maryland enacted new legislation to increase the usage of renewable energy in the marketplace.  This initiative, known as the renewable energy portfolio standard, "promotes development of renewable sources of electricity by requiring that specified and increasing percentages of retail electricity sold by suppliers in Maryland be derived from renewable sources."[1]  Br. of Appellees at 5 (citing Pub. Util. § 7-703(a), (b)).

One problem underlying the use of renewable energy in a competitive marketplace arises from the nature of the country's electric grid: the electricity's source is impossible to track once it flows into the grid.  Though suppliers across the country generate and distribute electricity to customers, federally regulated transmission organizations manage regional portions of the electric grid itself.  Maryland lies within the service territory managed by the PJM Interconnection, one of these transmission entities.  The PJM's

---

[1] The 2004 legislation utilizes a phase-in approach in which the retail energy supply will increasingly be derived from renewable sources, from a requirement of 3.5% renewable in 2006 to 52.5% in 2030.  Pub. Util. § 7-703(b)(1), (25).

4

service territory encompasses a noncontiguous section of the country centering on Pennsylvania, New Jersey, Delaware, Maryland, West Virginia, Virginia, and Ohio with outlying portions in North Carolina, Indiana, Michigan, and Illinois.

The PJM Interconnection only manages the flow of electricity in and out of the region above—and the various sources of electricity "cannot be differentiated once [the electricity] enters the PJM grid." J.A. 244. So, if a Maryland consumer wants to select a supplier who exclusively generates energy from wind farms (rather than, say, from coal), it is impossible to guarantee that wind-derived energy will end up in the customer's home. To resolve this problem, numerous states use renewable energy credits (RECs), which are intangible instruments representing one megawatt-hour of generated renewable energy. Under the REC system, a wind farm in Texas may acquire many credits through its generation of renewable energy and subsequently trade those credits to non-renewable energy suppliers in Maryland. The precise definition of a REC typically differs by state. In Maryland, a REC is defined as a

> credit equal to the generation attributes of one megawatt-hour of electricity that is derived from a Tier 1 renewable source or Tier 2 renewable source that is located: (1) in the PJM region; (2) outside the PJM region but in a control area that is adjacent to the PJM region; or (3) on the outer continental shelf of the Atlantic Ocean.

Pub. Util. § 7-701(m).[2] Under Maryland law, therefore, RECs are defined in part by their geographic origin.

---

[2] Tiers 1 and 2 describe the specific energy source, such as wind and solar (Tier 1) and hydropower (Tier 2). *Id.* § 7-701(s), (t).

RECs presented a marketing and advertising problem in the Maryland consumer marketplace. The State found consumers were increasingly unaware that despite selecting and paying a premium for a supplier they believed to be providing renewable energy, the electricity introduced to the grid from that supplier was not derived from solely renewable sources. This is because suppliers offering electricity directly to consumers could purchase RECs in order to represent that the energy they delivered was "clean" or "green."

Seeking to remedy this problem of consumer confusion, Maryland passed Senate Bill 1 ("S.B. 1"), now codified as section 7-707 of the Public Utility Code. S.B. 1 regulates retail electricity suppliers in marketing so-called "green power." Pub. Util. § 7-707(a). More specifically, it prohibits certain suppliers[3] from marketing their electricity as "clean, green, eco-friendly, environmentally friendly or responsible, carbon-free, 100% renewable, 100% wind, 100% hydro, 100% solar, 100% emission-free, or similar claims" unless the electricity offered by the supplier is at least 51%[4] renewable or backed by RECs derived from within the PJM region. Pub. Util. § 7-701(m); *id.* § 7-707(a), (c). Due to Maryland's geographic restriction in its definition of RECs, this means a supplier may not

---

[3] The statute exempts several entities from this requirement: the state's Department of General Services, "community choice aggregator[s]" (i.e., locally formed entities seeking to supply electricity for their own communities), and "any electricity supplier when marketing to commercial retail electric customers." Pub. Util. § 7-707(b).

[4] Sections 7-707(c)(1)(i) and (ii) specifically require that the green power offered by the supplier "equals or exceeds the greater of" 51% or 1% higher than the yearly standard dictated by section 7-703(b). *See supra* note 1. For ease of reference, we will use the 51% benchmark as shorthand though the current requirement of section 7-703(b) is something less than that.

market its electricity as "green" even if it is fully backed by renewable energy credits derived from outside the PJM boundaries. Pub. Util. § 7-701(m); *id.* § 7-707(a), (c).

S.B. 1 also has two disclosure-related provisions. First, suppliers must include the following model disclosure "or a similar disclosure approved by the [PSC]":

> We deliver energy through the purchase of renewable energy credits (RECs). A REC represents the social good that accompanies 1 megawatt-hour of renewable electricity generation. RECs may be sold separately from renewable electricity itself. Renewable electricity and RECs may be sold to different entities. The purchase of a REC does not indicate that renewable electricity itself has been purchased by the entity that purchased the REC.

*Id.* § 7-707(f)(2). Second, S.B. 1 also tasks the PSC with adopting regulations requiring suppliers marketing green power to include a disclosure in their marketing materials explaining

(1) what the customer will actually be paying for when the customer purchases green power from the electricity supplier;

(2) how the electricity that the customer has purchased is generated;

(3) how the green power will benefit the environment;

(4) the percentage of electricity that would be provided by the electricity supplier that is eligible for inclusion in meeting the renewable energy portfolio standard; and

(5) the state in which the electricity was generated.

*Id.* § 7-707(g). On December 30, 2024, the PSC issued precise disclosure language, directing suppliers "offering green power for sale to residential customers" to include its specific language "or a similar message approved by the [PSC]" in order to comply "with

7

the disclosure requirements of Public Utilities Article, § 7-707(f) and (g)."[5]  Md. Code Regs. 20.53.07.07(B)(4)–(5) (2025).

Plaintiffs sued to enjoin these provisions of S.B. 1 on First Amendment grounds and later moved for a preliminary injunction.[6]  Both the complaint and motion present a facial challenge to S.B. 1.  Following a hearing on November 18, 2024, the district court denied Plaintiffs' motion for a preliminary injunction in an oral ruling, concluding that Plaintiffs were unlikely to succeed on the merits of their claim.  The court determined that because S.B. 1's speech restriction regulates commercial speech, judicial review of the restriction applies intermediate—not strict—scrutiny.  Under that standard, the court found that Plaintiffs were not likely to succeed on the merits.  The court further concluded that the statute's compelled-disclosure provisions likewise were properly analyzed under intermediate scrutiny and were likely to survive under that standard.  Plaintiffs now appeal the denial of the preliminary injunction.

## II.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

---

[5] Plaintiffs argue this order has "superseded" the statutory provisions in sections 7-707(f) and (g).  Opening Br. at 15.

[6] Plaintiffs' complaint also alleged dormant Commerce Clause violations.  This appeal, however, is limited to Plaintiffs' First Amendment arguments for the requested preliminary injunction.

the public interest." *Winter*, 555 U.S. at 20.  This Court reviews the denial of a preliminary injunction under an abuse of discretion standard.  *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024).  "Pursuant to this standard, we review legal conclusions de novo and factual findings for clear error."  *Id.*

To prevail in a facial challenge of a statute on First Amendment grounds, a plaintiff must demonstrate "that no set of circumstances exists under which [the law] would be valid, . . . that the [law] lacks any plainly legitimate sweep[,]" or "that the law is 'overbroad [because] a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (alterations in original) (quoting *United States v. Stevens*, 559 U.S. 460, 472–73 (2010)).

## III.

On appeal, Plaintiffs contend that the district court erred when it denied their motion for a preliminary injunction as to both the speech restriction and the compelled disclosure provisions.  First, Plaintiffs claim that the district court applied the incorrect level of scrutiny when it applied intermediate scrutiny instead of strict scrutiny, and further argue they have a likelihood of success on the merits under strict scrutiny.  Second, and in the alternative, Plaintiffs assert that they have met their burden to establish the statute fails review even under intermediate scrutiny.  Plaintiffs make each argument separately as to the speech restriction and the disclosure provisions.

We first consider Plaintiffs' challenge to the speech restriction.  Applying the *Winter*

9

factors, we perform an initial inquiry of whether Plaintiffs are likely to succeed on the merits. Because we find that Plaintiffs are likely to prevail in showing S.B. 1's speech restriction fails even under intermediate scrutiny, we then consider the remaining *Winter* factors and ultimately conclude that each weighs in Plaintiffs' favor.

A.

The central inquiry regarding Plaintiffs' likelihood of success on the merits is whether S.B. 1's speech restriction is constitutionally permissible. Plaintiffs first argue that the district court erred in applying intermediate scrutiny. They contend that the restriction is content- and viewpoint-based and therefore requires review under strict scrutiny. However, we need not resolve this question because we find that Plaintiffs prevail even under the intermediate scrutiny standard applicable to commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562–63 (1980) (holding that "[t]he Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.").

Under *Central Hudson*, courts apply "a four-part intermediate scrutiny test" to determine whether a commercial speech restriction is constitutional:

> (1) to receive any First Amendment protection, commercial speech "must concern lawful activity and not be misleading;" (2) the government must assert a "substantial" government interest to justify its regulation; (3) the regulation must "directly advance[] the governmental interest asserted;" and

10

(4) the regulation must not be "more extensive than is necessary to serve that interest."

*W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 301 (4th Cir. 2009) (alteration in original) (quoting *Central Hudson*, 447 U.S. at 566).  We first consider whether the regulated speech is misleading and then turn to the remaining elements.

i.

The first *Central Hudson* factor establishes the constitutional floor for First Amendment protection.  "Supreme Court cases 'make clear that the State may ban commercial expression that is fraudulent or deceptive without further justification.'" *Recht v. Morrisey*, 32 F.4th 398, 410 (4th Cir. 2022) (quoting *Edenfield v. Fane*, 507 U.S. 761, 768 (1993)).  "[A]t this step, we ask whether the regulated speech is inherently misleading or whether there is evidence that it is actually misleading." *Id.*  However, "[s]tates may not place an absolute prohibition on certain types of potentially misleading information[] . . . if the information also may be presented in a way that is not deceptive." *In re R.M.J.*, 455 U.S. 191, 203 (1982).

Maryland argues S.B. 1 regulates inherently misleading speech that should receive no First Amendment protection.  We disagree.  The State contends, for example, that "representations of delivering '100% wind electricity'" would be "untrue unless the customer's residence is physically connected to a windmill, and [suppliers'] representations of delivering '100% solar electricity' are untrue unless the residence is

11

physically connected to solar panels." Br. of Appellees at 34. But in this argument, the State only demonstrates that one possible use of these terms is misleading, which is not enough to deprive the language of any First Amendment protection. *See In re R.M.J.*, 455 U.S. at 203. For example, a supplier could advertise that it is a "green" choice because it purchases RECs from generators of "100% wind" or "100% solar" energy. Furthermore, S.B. 1 covers terms and phrases beyond the mere "100% wind" and "100% solar" examples cited by the State—the statute prohibits suppliers' use of terms such as "clean, green, eco-friendly, environmentally friendly or responsible, . . . or similar claims." Pub. Util. § 7-707(a). Maryland fails to demonstrate how the use of these terms is inherently misleading. We accordingly find that the State does not meet the high bar to establish that the regulated terms are inherently misleading because the targeted speech includes phrases that may be presented in ways that are not deceptive. *See In re R.M.J.*, 455 U.S. at 203; *Edenfield*, 507 U.S. at 768–69 (holding that a restriction that prohibits both "truthful and nonmisleading expression" alongside "fraudulent or deceptive commercial speech" must be assessed against the remaining *Central Hudson* elements).

Maryland further argues that "consumers will likely be confused" about the complexity of the energy grid and REC system, perhaps in an effort to show that the regulated speech is actually misleading. But the State cites no authority for the proposition that potentially confusing speech is not protected by the First Amendment, and the Supreme Court has in fact provided guidance to the contrary. *See In re R.M.J.*, 455 U.S. at 203 ("[R]estrictions upon [potentially deceptive and confusing advertising] may be no broader than reasonably necessary to prevent the deception."). We accordingly agree with

12

the district court's conclusion that the speech regulated by S.B. 1 is not inherently or in fact misleading.

ii.

The second *Central Hudson* factor calls for a determination of whether Maryland has "assert[ed] a substantial interest to be achieved by restrictions on commercial speech." *Central Hudson*, 447 U.S. at 564. Maryland offers two state interests on appeal: first, consumer protection, and second, "promoting development of renewable energy sources in Maryland and the PJM region." Br. of Appellees at 37, 39.

There is no dispute on appeal that the first interest is substantial.[7] However, Plaintiffs argue the State's second stated interest is forfeited because the State only raised it for the first time during the preliminary injunction hearing, noting that a mere "'passing shot' 'cannot preserve [an] issue for appellate review.'" Reply Br. at 17 (alteration in original) (quoting *Sines v. Hill*, 106 F.4th 341, 349 (4th Cir. 2024)). Even assuming *arguendo* that the State did not forfeit this interest, we nonetheless find that we may not properly consider it because it did not raise this rationale prior to litigation.

---

[7] In the realm of commercial speech regulations, states' interests are sufficiently "substantial" when the state acts to protect consumers from, *inter alia*, "fraud, undue influence, . . . and other forms of vexatious conduct," *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 (1978) (citation modified), or when states seek to "protect[] consumers" from misleading information, *Edenfield*, 507 U.S. at 768. Here, Maryland's asserted interest clearly falls within the realm of protecting consumers from misleading information such that this interest is undoubtedly substantial.

13

A state's justification for a restriction subject to intermediate scrutiny "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). In a later case, the Supreme Court reaffirmed this rule in declining to consider a "backup" interest where the governmental body "never raised concerns along [those] lines in its contemporaneous correspondence" prior to litigation. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022).

Maryland does not adequately show that it asserted an interest in promoting renewable energy within the PJM region prior to litigation. The contemporaneous evidence surrounding S.B. 1's drafting, endorsement, and passage overwhelmingly supports the notion that consumer protection was the State's concern. The only contemporaneous correspondence supporting an interest in local energy generation is a letter from a Baltimore City Councilman (a non-legislator) endorsing S.B. 1 for giving consumers confidence that "they are actually supporting Maryland's climate strategy" because the bill "require[es] energy companies to purchase more [PJM] renewable energy certificates, meaning that the certificates are local." Br. of Appellees at 10 (quoting *Electricity and Gas—Retail Supply—Regulation and Consumer Protection*: *Hearing on S.B.1 Before the H. Comm. on Econ. Matters*, 2024 Leg., 446th Sess. (Md. 2024) (statement of Councilman Mark Conway)). Such a limited comment from outside the confines of the legislature fails to demonstrate that Maryland's legislative body seriously considered this as a substantial state interest in crafting the speech restriction in S.B. 1. Moreover, Maryland did not even assert this interest until late in the litigation process. An interest in promoting local or regional renewable energy did not feature in the State's briefs before the district court, and

14

the State mentioned this for the first time only during oral arguments for the preliminary injunction hearing (and now again on appeal). We accordingly may not consider Maryland's second proposed interest.

We instead cabin our review to Maryland's first proposed interest in protecting consumers from misleading information and price gouging by energy companies. In so doing, we find Maryland has asserted a substantial interest to be achieved by restrictions on commercial speech. *See Central Hudson*, 447 U.S. at 564.

iii.

The remaining *Central Hudson* factors "focus on the relationship between the State's interests and the [regulation]." 447 U.S. at 569. Under the third and fourth factors, we must determine whether the speech restriction "directly advance[s] the governmental interest and [is] no more extensive than necessary to serve that interest." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486 (1995). Together, these factors consider "the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Id.* (citation modified). Plaintiffs argue that S.B. 1's restrictions do not directly advance the State's asserted interest in consumer protection and are not adequately tailored. We agree.

To show the regulation advances the interest of the State, Maryland must demonstrate "that the harms it recites are real and that [the challenged regulation's] restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 762. "[A] State may justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether—or even based solely on history, consensus, and simple

15

common sense." *Recht*, 32 F.4th at 413–14 (citation modified). Yet "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson*, 447 U.S. at 564.

The district court found in favor of the State for this inquiry, noting that Maryland's proffered evidence of consumer confusion generated "a direct link [with] the harm sought to be addressed by [S.B. 1]." J.A. 263. But a "direct link" is not enough under *Central Hudson*'s test. Though the burden on the State at this stage is not onerous, we find that S.B. 1 does not alleviate Maryland's stated interest in consumer protection in a material way. We do not doubt that consumers are confused about the general nature of the electricity grid and structure of the REC system. The host of evidence on this point clearly shows that the harms the State cites are real. Even so, *Central Hudson* requires an adequate fit between the speech restriction and the harms the State intends to alleviate, not merely a "link." Here, there simply is not a close enough fit.

As discussed above, Maryland's stated interest is to reduce consumer confusion about the renewable energy market and the role of RECs. Consumer testimony submitted to the legislature provides examples of this confusion: the Maryland Energy Advocates Coalition (MEAC) explained that "'[e]co-buyers are wooed into retail energy with promises of clean electricity' and 'assume they're paying for actual wind and clean energy.'" Br. of Appellees at 11 (alteration in original) (quoting J.A. 189). One resident referred to her supplier's advertisement of "100% wind energy" as "entirely misleading." J.A. 196 (emphasis omitted). Another consumer felt "duped" by an energy company that marketed that its consumers "were buying wind and solar energy." J.A. 198 (emphasis

16

omitted). She expressed frustration over paying higher prices before learning the electricity provided by that supplier was merely backed by credits and she wasn't "getting wind energy from a wind farm feeding energy into the grid." *Id.* This testimony demonstrates general consumer confusion about the REC system—critically, however, the restriction alone does not address any of this confusion.

Plaintiffs correctly point out that "a supplier can still call its energy 'green' if it is backed by RECs" as long as those RECs are sourced from an area within the PJM region. Opening Br. at 34. Therefore, a supplier advertising to a customer in Baltimore may still refer to its product as "100% renewable" as long as just 51% of the electricity is backed by RECs generated outside Chicago (within the PJM region), whereas a supplier purchasing RECs generated from renewable sources in Texas (outside the PJM region) may not. Consequently, S.B. 1 problematically allows for confusing marketing to persist—defeating the State's asserted interest in protecting consumers from misleading information, rather than advancing it.

In response, Maryland urges us to consider how "S.B. 1's marketing restriction works together with its disclosure requirement" to alleviate confusion. Br. of Appellees at 43. Maryland argues the restriction and disclosure work in tandem "to ensure that Maryland consumers know that the 'green' power they buy is backed by RECs, know what RECs are, know where the renewable electricity that created the RECs was generated, and know what percentage of the RECs meet Maryland's [statutory] requirements." *Id.* In some circumstances, this may be relevant. *See Recht*, 32 F.4th at 419–20 (concluding that West Virginia's speech "prohibitions and disclosures work together to accomplish" the

17

State's desired goal to ensure attorneys were advertising their services truthfully).  But here, all of the work of resolving consumer confusion is done by the disclosures, not the restriction.  The restriction is ineffective in alleviating confusion if a supplier may come into compliance by simply acquiring its RECs from within a certain portion of the country without otherwise changing its behavior.  The resulting poor fit cannot be saved by the compelled disclosures.

To the extent that Maryland also argues consumers are confused specifically about where RECs originate, we similarly find the restriction is ineffective in alleviating even this form of confusion.  Again, "[a]ll the [restrictive] provisions do is place a *geographic* restriction on which RECs may be marketed as 'green.'" Reply Br. at 11.  That geographic restriction itself "draws curious lines." *Grimmett v. Freeman*, 59 F.4th 689, 696 n.9 (4th Cir. 2023) (reversing the denial of a preliminary injunction for a speech restriction and emphasizing the restriction's underinclusive nature).  S.B. 1 effectively exempts suppliers who source RECs from within the PJM region, which encompasses territory hundreds of miles from the State of Maryland.  Even if, for example, a resident of Baltimore was confused about whether his RECs were generated locally, the State offers no evidence showing that this resident would be any less confused if he merely knew a bulk of those credits originated from an area ranging from Greater Chicago to North Carolina.  In other words, we have no benchmark showing how Maryland residents conceive of "local" versus "distant" locations for RECs.  Common sense does not aid the State here, either.  It does not seem reasonable to conclude that, in the absence of any other evidence, a resident of Baltimore is likely to consider a wind farm in northern Illinois as a "local" geographic

18

location rather than a distant one.[8]  Ultimately, S.B. 1's "regulatory regime is so pierced by exemptions and inconsistencies that the [State] cannot hope to exonerate it." *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999).

We have pointed out before that "[i]n each case where the Supreme Court affirmed the legislative judgment as reasonable, a logical correlation existed between the legislative objective and the means selected to achieve that objective." *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1313 (4th Cir. 1995), *vacated*, 517 U.S. 1206 (1996).  No such logical correlation exists here.  Although it may seem counterintuitive that a speech restriction targets too little speech, that S.B. 1 tolerates green advertising with in-region RECs but not out-of-region RECs "raise[s] doubts about whether the government is in fact pursuing the interest it invokes" and "reveal[s] that [the] law does not actually advance a compelling interest." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448–49 (2015).

---

[8] Beyond our conclusion that S.B. 1 does not directly respond to Maryland's concern that consumers are confused about the location RECs originate, we also have serious concerns regarding the sufficiency of Maryland's evidence supporting that this is a non-hypothetical concern.  In support of its contention that consumers are confused about where RECs originate, Maryland offers only a single consumer comment submitted to the FTC from 2010.  The FTC summarized the comment as follows: "consumers may believe that the renewable energy they purchase is generated in their geographic location, when, in fact, the utility may have purchased RECs generated in a distant location."  Guides for the Use of Environmental Marketing Claims, 75 Fed. Reg. 63552, 63590 (Oct. 15, 2010) (codified at 16 C.F.R. pt. 260).  Such a comment borders on "mere speculation or conjecture," which is insufficient for this stage of *Central Hudson*. *See Fla. Bar v. Went for It*, 515 U.S. 618, 626 (1995); *see also Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 992 (10th Cir. 2020) ("[T]hese sorts of equivocal and hypothetical statements about the *possibility* of a connection between [the proposed harm] and [the speech restriction] are insufficient . . . .").

19

Based on the evidence before us at this stage in litigation, Maryland fails to show that S.B. 1's restriction materially alleviates the real harm it has identified, thus failing *Central Hudson*'s third factor. The State therefore fails to successfully defend the speech restriction. *See Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 624 (1995) (explaining the Government must satisfy *all* of *Central Hudson*'s factors to defend its restriction). Accordingly, in seeking a preliminary injunction, Plaintiffs have established the requisite likelihood of success in showing the speech restriction is unconstitutional. *See Winter*, 555 U.S. at 20.

### B.

We thus turn to the remaining preliminary injunction factors, which examine whether Plaintiffs will suffer irreparable harm absent equitable relief, whether the balance of equities leans in Plaintiffs' favor, and whether an injunction is in the public interest. *See Winter*, 555 U.S. at 20. We find that Plaintiffs prevail on all three factors. Because in First Amendment cases, the "plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim," no further inquiry is needed on this factor. *Musgrave*, 553 F.3d at 298 (citation modified); *see also In re Murphy-Brown, LLC*, 907 F.3d 788, 801 (4th Cir. 2018) ("First Amendment infringements . . . are per se irreparable injuries." (citation modified)). We thus turn to the balance of equities and public interest.

20

These factors also favor injunctive relief, and are similarly informed by likelihood of success on the merits. In the First Amendment context,

> the threatened injury to Plaintiffs easily outweighs whatever burden the injunction may impose. At a minimum, each Plaintiff faces a loss of . . . valuable business opportunities. By contrast, the State of Maryland is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions. . . . And . . . upholding constitutional rights is in the public interest.

*Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). Accordingly, we find that Plaintiffs have satisfied all four *Winter* factors regarding S.B. 1's speech restriction, and therefore the district court erred in denying their motion for a preliminary injunction as to S.B. 1's speech restriction. Because S.B. 1's speech restriction is codified in section 7-707(c) of Maryland's Public Utility Code, we limit the preliminary injunction to that statutory provision.[9]

## IV.

Having established Plaintiffs' likely success in demonstrating the unconstitutionality of S.B. 1's speech restriction, we turn to their challenge to the law's

---

[9] Plaintiffs urge us to find that the "speech regulations are not severable from [S.B. 1]'s dual-market structure." Opening Br. at 57. In Maryland, unless stated otherwise in the statute itself, "the provisions of all statutes . . . are severable," and a court's finding "that part of a statute is unconstitutional or void does not affect the validity of the remaining portions of the statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent." Md. Gen. Provisions § 1-210; *see also Leavitt v. Jane L.*, 518 U.S. 137,139 (1996) ("Severability is of course a matter of state law."). At this stage, we do not consider the remaining provisions of S.B. 1 incomplete or incapable of being executed in accordance with legislative intent to override the "strong presumption" that an invalid portion of a statute "be severed." *Jackson v. Dackman Co.*, 30 A.3d 854, 869 (Md. 2011).

required disclosures.  As mentioned above, Plaintiffs argue first that the district court erred in failing to apply strict scrutiny, and next contend in the alternative that the statute would fail review even under intermediate scrutiny.  But before we can consider Plaintiffs' likelihood of success on these arguments under *Winter*, we consider the regulatory developments that followed the district court's order on the preliminary injunction.  Ultimately, we find that the most prudential resolution at this stage is to remand the question of the constitutionality of S.B. 1's compelled speech provisions to the district court.

S.B. 1 requires energy suppliers that advertise "green power" to consumers to include a disclosure in their advertisements.  Pub. Util. § 7-707(f)(2)–(g).  In section 7-707(f)(2), the statute provides "model" disclosure language and grants the PSC discretion to approve alternate language.  In section 7-707(g), the statute tasks the PSC with "adopt[ing] regulations that require an electricity supplier" marketing green power "to include in the electricity supplier's marketing materials a disclosure, written in plain language, that explains" five separate informational items about the electricity the customer is purchasing.  The district court evaluated the constitutionality of the model disclosure under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), and found that Plaintiffs were not likely to succeed in showing the provision is unlawful.

However, after the district court made its ruling on Plaintiffs' requested preliminary injunction, the PSC issued an order (the "Commission Order") promulgating new disclosure language.  The Commission Order, subsequently codified in the Code of

22

Maryland Regulations, requires all suppliers marketing "green energy" to include the following disclosure in their marketing materials:

> The electricity delivered to your home is generated from a variety of sources, both renewable and nonrenewable. Energy from renewable resources, such as wind and solar, cannot be tracked directly into your home. Instead, the energy your home uses will support renewable energy sources through the purchase of renewable energy credits ("RECs"). A REC represents the environmental and social good associated with 1 megawatt hour of renewable electricity generation. RECs may be sold separately from the electricity itself, so the buyer of a REC may be different than the buyer of the electricity. In your contract, X% of the RECs qualify for Maryland's renewable portfolio standard. By purchasing RECs that qualify for Maryland's renewable portfolio standard, you are supporting renewable energy development in the region. Increased demand for, and generation of, renewable electricity can help reduce conventional electricity generation from fossil fuels in the region where the renewable electricity generator is located. It may also have other environmental benefits such as reducing regional air pollution.

Md. Code Regs. 20.53.07.07(B)(4) (2025). This language is materially different from the model language originally reviewed by the district court, and the district court has not yet had the opportunity to evaluate the constitutionality of this now-mandatory language. This raises the question of what our proper role is: whether we review the district court's order as to now-superseded model language from the statute (as Maryland requests), or whether it is appropriate for us to evaluate the new language not yet reviewed by the district court (as Plaintiffs request). We conclude that neither path is appropriate; rather, the district court is in the best position to evaluate in the first instance the now-operative new disclosure language.

Though Maryland argues we should only examine S.B. 1's model language and directives, any review of the now-irrelevant model language has become moot on appeal.

23

*See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 336 (4th Cir. 2021) (en banc) (stating that a case "becomes moot" when it is "impossible for a court to grant any effectual relief whatever to the prevailing party" (citation modified)). A live dispute must exist between the parties at all stages of litigation. *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997). A dispute is moot when "the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citation modified). "And the parties lack such an interest when, for example, our resolution of an issue could not possibly have any practical effect on the outcome of the matter." *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010). Because the Commission Order supplants S.B. 1's model language, an injunction of the model language would provide no relief to Plaintiffs, whose commercial speech is still burdened. Said another way, whether we enjoin the statute or not has no "practical effect"; either way, the statutory requirement is not in effect. *See id.*

As for the statutory directives to promulgate disclosure language, the district court did not specifically address whether the provision is facially constitutional. Passing on this question was not in error. Indeed, without clarity as to how the PSC would actually implement the disclosures, Plaintiffs' actual ask of the court below was "to read subtext into the [statute]'s text" to challenge the PSC's then-not-yet-executed interpretation, which is not "fertile ground for a facial attack against the [statute]." *See Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 104 (4th Cir. 2026). At this point, however, the PSC has acted on its directives, and Plaintiffs "can challenge that

24

interpretation in [the Commission Order]." *See id.* (quoting *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 103 (D.D.C. 2025)).

Even though Plaintiffs request we evaluate the Commission Order's new disclosure language now, we decline to perform the initial review of its constitutionality. Federal appellate courts are "court[s] of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005); *see also Holland v. Big River Mins. Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) ("Generally, issues that were not raised in the district court will not be addressed on appeal."). We thus decline to decide whether the district court erred in denying Plaintiffs' requested preliminary injunction as to S.B. 1's compelled disclosure requirement and remand the question of the constitutionality of S.B. 1's compelled disclosure, as promulgated by the Commission Order, to the district court for initial review.

Though our analysis ends here, "our court regularly issues opinions to provide guidance on remand in the interest of judicial efficiency." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 n.2 (4th Cir. 2007). We take this opportunity to highlight several constitutional considerations that the district court should address on remand. As the district court already correctly explained, *Zauderer* requires that compelled disclosures (1) reflect "purely factual and uncontroversial information about the terms under which [Plaintiffs'] services will be available" and (2) be "reasonably related to the State's interest in preventing deception of consumers," 471 U.S. at 651, in which case "such requirements should be upheld unless they are 'unjustified or unduly burdensome,'" *Nat'l Inst. of Fam. and Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 769 (2018) (quoting *Zauderer*, 471 U.S. at 651).

On remand, the district court should undertake a substantive review of the Commission Order against this standard. For example, the court should consider whether the disclosure's text concerning customer support of regional renewable energy generation and the environmental benefits of RECs is purely factual and uncontroversial. *See Zauderer*, 471 U.S. at 651. In addition, in evaluating the burden of the compelled speech, the district court should assess whether the new disclosure threatens to "drown[] out" energy suppliers' own protected commercial speech, given that the disclosure must be included with all marketing materials. *See Md. Shall Issue, Inc. v. Anne Arundel County*, 91 F.4th 238, 251 (4th Cir. 2024); *see also NIFLA*, 585 U.S. 755, 778 (2018) (explaining that a mandatory 29-word disclosure threatens to drown out a two-word statement on a billboard).

## V.

For the foregoing reasons, we reverse the district court's judgment in part and remand the case with instructions to preliminarily enjoin section 7-707(c) of Maryland's Public Utility Code and to review the constitutionality of the disclosures required by the Commission Order.

*REVERSED IN PART AND*
*REMANDED WITH INSTRUCTIONS*

26